401 U.S. 355 (1971)
RELFORD
v.
COMMANDANT, U. S. DISCIPLINARY BARRACKS, FT. LEAVENWORTH.
No. 98.
Supreme Court of United States.
Argued December 15-16, 1970.
Decided February 24, 1971.
CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE TENTH CIRCUIT.
*356 Judson W. Detrick, by appointment of the Court, 397 U. S. 1020, argued the cause and filed briefs for petitioner.
Solicitor General Griswold argued the cause for respondent. With him on the brief were Assistant Attorney General Wilson, Deputy Solicitor General Springer, Beatrice Rosenberg, and Roger A. Pauley.
MR. JUSTICE BLACKMUN delivered the opinion of the Court.
In O'Callahan v. Parker, 395 U. S. 258, decided June 2, 1969, by a five-to-three vote, the Court held that a court-martial may not try a member of our armed forces charged with attempted rape of a civilian, with housebreaking, and with assault with intent to rape, when the alleged offenses were committed off-post on American territory, when the soldier was on leave, and when the charges could have been prosecuted in a civilian court. What is necessary for a court-martial, the Court said, is that the crime be "service connected." 395 U. S., at 272.
O'Callahan's military trial, of course, was without those constitutional guarantees, including trial by jury, to which he would have been entitled had he been prosecuted in a federal civilian court in the then Territory of Hawaii where the alleged crimes were committed.
O'Callahan already has occasioned a substantial amount of scholarly comment.[1] Much of it characterizes the decision as a significant one because it is said to depart from long-established, or at least long-accepted, *357 concepts. Some of the literature is generally approving.[2] Some of it is generally critical.[3] Some of it, as did the O'Callahan dissent, 395 U. S., at 284, forecasts a period of confusion for both the civil and the military courts.[4] Not surprisingly, much of the literature is concerned with the issue of O'Callahan's retrospectivity. Some writers assert that the holding must be applied retroactively.[5] Others predict that it will not be so applied.[6] Naturally enough, O'Callahan has had its references *358 in the federal courts of appeals[7] and in a significant number of cases in the United States Court of Military Appeals.[8]
*359 In the present federal habeas corpus case, instituted several years after the applicant's conviction by court-martial, certiorari was granted "limited to retroactivity *360 and scope of O'Callahan v. Parker . . . ." 397 U. S. 934 (1970). We thus do not reconsider O'Callahan. Our task here concerns only its application.

I
Isiah Relford, in 1961, was a corporal on active duty in the United States Army. He was stationed at Fort Dix, New Jersey.
On September 4, 1961, the visiting 14-year-old sister of another serviceman, who was on leave from his Army station at Fort Campbell, Kentucky, and who came to Fort Dix when his wife delivered a child at the base hospital, was abducted at the point of a knife from an automobile in the hospital's parking lot as she waited for her brother. The girl was raped by her abductor.
A few weeks later, on October 21, the wife of an Air Force man stationed at McGuire Air Force Base, adjacent to Fort Dix, was driving from her home on the base to the post exchange concession, also on the base, where she worked as a waitress. As the woman slowed her automobile for a stop sign, a man gained entry to the car from the passenger side and, with a knife at her throat, commanded the woman to drive on some distance to a dirt road in the fort's training area. She was raped there.
The second victim, with her assailant still in the automobile, was able to make her predicament known to military police. The assailant was apprehended and turned out to be Relford. He immediately admitted consensual intercourse with the victim. The next morning, after a brief interrogation, he confessed to kidnaping and raping both women.
At the time of each incident Relford was in civilian clothes.
It is undisputed that these events all took place on the military reservation consisting of Fort Dix and the contiguous McGuire Air Force Base.
*361 Relford, in due course, was charged with raping and kidnaping each of the women, in violation of Arts. 120 and 134, respectively, of the Uniform Code of Military Justice, 10 U. S. C. §§ 920 and 934.[9] He was tried by a general court-martial in December 1961 and was convicted on the four charges. Relford's sentence was the forfeiture of all pay and allowances, reduction to the lowest enlisted grade, and death. The customary reference to the staff judge advocate was made and the convening authority approved. U. C. M. J. Arts. 60-65, 10 U. S. C. §§ 860-865. Upon the review by the Army Board of Review,[10] required under the Code's Art. 66, 10 U. S. C. § 866, the conviction was sustained; the sentence, however, was reduced to hard labor for 30 years, total forfeitures, and a dishonorable discharge. The Court of Military Appeals denied a petition for review on September 24, 1963. United States v. Relford, 14 U. S. C. M. A. 678.
*362 Relford's case thus became final more than five and a half years prior to this Court's decision in O'Callahan v. Parker.
In 1967, Relford, being in custody in the United States Disciplinary Barracks at Leavenworth, Kansas, filed his application for a writ of habeas corpus with the United States District Court for the District of Kansas. He alleged inadequate representation by counsel in the military proceeding. Chief Judge Stanley found no merit in the claim and denied the application. On appeal, Relford repeated the inadequate-representation claim and, for the first time, raised questions as to the admissibility of his confession, as to a lineup procedure, and as to the fairness of his military trial. The Tenth Circuit reviewed all these claims on the merits, but affirmed the District Court's denial of relief. Relford v. Commandant, 409 F. 2d 824 (1969).[11]
The Tenth Circuit's opinion was filed on April 23, 1969, several weeks prior to this Court's decision in O'Callahan v. Parker. The issue as to the propriety of trial by court-martial, perhaps understandably, was not raised before Judge Stanley or on the appeal to the Tenth Circuit; the issue, however, had been presented in O'Callahan's chronologically earlier appeal in his habeas proceeding. See United States ex rel. O'Callahan v. Parker, 390 F. 2d 360, 363-364 (CA3 1968).

II
This case, as did O'Callahan, obviously falls within the area of stress between the constitutional guarantees contained in the Constitution's Art. III, § 2, cl. 3, in the Sixth Amendment, and possibly in the Fifth Amendment, on the one hand, and, on the other, the power vested in *363 the Congress, by the Constitution's Art. I, § 8, cl. 14, "To make Rules for the Government and Regulation of the land and naval Forces," with its supportive Necessary and Proper provision in cl. 18, and the Fifth Amendment's correlative exception for "cases arising in the land or naval forces."
Relford argues that O'Callahan's requirement that the crime be "service connected" before a court-martial may sit demands that the crime itself be military in nature, that is, one involving a level of conduct required only of servicemen and, because of the special needs of the military, one demanding military disciplinary action. He further states that the charges against himlike those against O'Callahando not involve a level of conduct required only of servicemen. He maintains that occurrence of the crimes on a military reservation and the military-dependent identity of one of his victims do not substantially support the military's claim of a special need to try him.
In further detail, it is stated that the Court in O'Callahan recognized that a court-martial "remains to a significant degree a specialized part of the overall mechanism by which military discipline is preserved," 395 U. S., at 265; that military courts, of necessity, are not impartial weighers of justice, but have as their primary consideration the enforcement of the unique discipline required of a fighting force; and that, as a consequence, the court-martial must be limited to the "least possible power adequate to the end proposed." United States ex rel. Toth v. Quarles, 350 U. S. 11, 23 (1955), citing Anderson v. Dunn, 6 Wheat. 204, 231 (1821).
It is then said that the level of conduct Relford is alleged to have violated, that is, intercourse only with consent, is the very same level required in the civilian community and is not altered by considerations of military dependency; that his alleged crimes are no more *364 military than were O'Callahan's; that the ability of the military to perform its mission remains the same whether the crimes with which he was charged were committed on base or off base; that any interest in the maintenance of order on the base is adequately served by apprehension of the offender and trial in a civilian court; that the on-post/off-post distinction has little meaning; that it is the nature of the crime that is important; that the crimes charged to Relford stand in contrast to purely military crimes such as desertion, absence without leave, missing movement, assaulting a superior commissioned officer, and being drunk on duty, U. C. M. J. Arts. 85, 86, 87, 90, and 112, 10 U. S. C. §§ 885, 886, 887, 890, and 912; and that only crimes of the latter type have "an immediate adverse impact upon the ability of the military to perform its mission," and are "proper subjects for the exercise of military jurisdiction."

III
In evaluating the force of this argument, the facts of O'Callahan and the precise holding in that case possess particular significance. We repeat: O'Callahan was in military service at the time and was stationed at a base in American territory. His offenses, however, took place off base in a civilian hotel while he was on leave and not in uniform.
MR. JUSTICE DOUGLAS, in speaking for the Court, said:
"In the present case petitioner was properly absent from his military base when he committed the crimes with which he is charged. There was no connection not even the remotest onebetween his military duties and the crimes in question. The crimes were not committed on a military post or enclave; nor was the person whom he attacked performing any duties relating to the military. Moreover, Hawaii, the situs of the crime, is not an armed *365 camp under military control, as are some of our far-flung outposts.
"Finally, we deal with peacetime offenses, not with authority stemming from the war power. Civil courts were open. The offenses were committed within our territorial limits, not in the occupied zone of a foreign country. The offenses did not involve any question of the flouting of military authority, the security of a military post, or the integrity of military property." 395 U. S., at 273-274.
We stress seriatim what is thus emphasized in the holding:
1. The serviceman's proper absence from the base.
2. The crime's commission away from the base.
3. Its commission at a place not under military control.
4. Its commission within our territorial limits and not in an occupied zone of a foreign country.
5. Its commission in peacetime and its being unrelated to authority stemming from the war power.
6. The absence of any connection between the defendant's military duties and the crime.
7. The victim's not being engaged in the performance of any duty relating to the military.
8. The presence and availability of a civilian court in which the case can be prosecuted.
9. The absence of any flouting of military authority.
10. The absence of any threat to a military post.
11. The absence of any violation of military property.
One might add still another factor implicit in the others:
12. The offense's being among those traditionally prosecuted in civilian courts.

IV
This listing of factors upon which the Court relied for its result in O'Callahan reveals, of course, that it chose *366 to take an ad hoc approach to cases where trial by court-martial is challenged. We therefore turn to those factors in Relford's case that, as spelled out in O'Callahan's, bear upon the court-martial issue.
It is at once apparent that elements 4, 6, 8, 11, and 12, and perhaps 5 and 9, operate in Relford's favor as they did in O'Callahan's: The offenses were committed within the territorial limits of the United States; there was no connection between Relford's military duties and the crimes with which he was charged; courts in New Jersey were open and available for the prosecution of Relford; despite the Vietnam conflict we may assume for present purposes that the offenses were committed in peacetime and that they were unrelated to any problem of authority stemming from the war power; military authority, directly at least, was not flouted; the integrity of military property was not violated; and the crimes of rape and kidnaping are traditionally cognizable in the civilian courts.
Just as clearly, however, the other elements, present and relied upon in O'Callahan's case, are not at hand in Relford's case. These are elements 1, 2, 3, 7, and 10: Relford was not absent from the base; the crimes were committed on the military enclave; the second victim, because of her duties at the post exchange and because of the fact that her abduction and the attack upon her took place as she was returning to the PX at the end of a short and approved break in her work, was engaged in the performance of a duty relating to the military; and the security of two women properly on the post was threatened and, indeed, their persons were violated.
There are still other significant aspects of the Relford offenses: The first victim was the sister of a serviceman who was then properly at the base. The second victim was the wife of a serviceman stationed at the base; she and her husband had quarters on the base and were living *367 there. Tangible property properly on the base, that is, two automobiles, were forcefully and unlawfully entered.

V
With the foregoing contrasting comparison of the pertinent factual elements of O'Callahan with those of Relford's case, we readily conclude that the crimes with which Relford was charged were triable by a military court. We do not agree with petitioner when he claims that the "apparent distinctions" between this case and O'Callahan "evaporate when viewed within the context of the `service-connected' test."[12] We stress: (a) The essential and obvious interest of the military in the security of persons and of property on the military enclave. Relford concedes the existence of this vital interest.[13] (b) The responsibility of the military commander for maintenance of order in his command and his authority to maintain that order. See Cafeteria & Restaurant Workers Union v. McElroy, 367 U. S. 886 (1961). Relford also concedes this. (c) The impact and adverse effect that a crime committed against a person or property on a military base, thus violating the base's very security, has upon morale, discipline, reputation and integrity of the base itself, upon its personnel and upon the military operation and the military mission. (d) The conviction that Art. I, § 8, cl. 14, vesting in the Congress the power "To make Rules for the Government and Regulation of the land and naval Forces," means, in appropriate areas beyond the purely military offense, more than the mere power to arrest a serviceman offender and turn him over to the civil authorities. The term "Regulation" itself implies, for those appropriate cases, the power to try and to punish. (e) The distinct possibility *368 that civil courts, particularly nonfederal courts, will have less than complete interest, concern, and capacity for all the cases that vindicate the military's disciplinary authority within its own community. See W. Winthrop, Military Law and Precedents 725 (2d ed. 1896, 1920 Reprint); Wilkinson, The Narrowing Scope of Court-Martial Jurisdiction: O'Callahan v. Parker, 9 Washburn L. J. 193, 208 (1970). (f) The very positive implication in O'Callahan itself, arising from its emphasis on the absence of service-connected elements there, that the presence of factors such as geographical and military relationships have important contrary significance. (g) The recognition in O'Callahan that, historically, a crime against the person of one associated with the post was subject even to the General Article. The comment from Winthrop, supra, at 724:
"Thus such crimes as theft from or robbery of an officer, soldier, post trader, or camp-follower . . . inasmuch as they directly affect military relations and prejudice military discipline, may properly be as they frequently have beenthe subject of charges under the present Article. On the other hand, where such crimes are committed upon or against civilians, and not at or near a military camp or post, or in breach or violation of a military duty or order, they are not in general to be regarded as within the description of the Article, but are to be treated as civil rather than military offenses." (Footnotes omitted.)
cited both by the Court in O'Callahan, 395 U. S., at 274 n. 19, and by the dissent at 278-279, certainly so indicates and even goes so far as to include an offense against a civilian committed "near" a military post. (h) The misreading and undue restriction of O'Callahan if it were interpreted as confining the court-martial to the purely military offenses that have no counterpart in nonmilitary *369 criminal law. (i) Our inability appropriately and meaningfully to draw any line between a post's strictly military areas and its nonmilitary areas, or between a serviceman-defendant's on-duty and off-duty activities and hours on the post.
This leads us to hold, and we do so hold, that when a serviceman is charged with an offense committed within or at the geographical boundary of a military post and violative of the security of a person or of property there, that offense may be tried by a court-martial. Expressing it another way: a serviceman's crime against the person of an individual upon the base or against property on the base is "service connected," within the meaning of that requirement as specified in O'Callahan, 395 U. S., at 272. This delineation, we feel, fully comports with the standard of "the least possible power adequate to the end proposed" referred to in O'Callahan, 395 U. S., at 265.
By this measure, Relford's alleged offenses were obviously service connected. There is, therefore, no constitutional or statutory barrier and Relford was properly tried by a court-martial.

VI
We recognize that any ad hoc approach leaves outer boundaries undetermined. O'Callahan marks an area, perhaps not the limit, for the concern of the civil courts and where the military may not enter. The case today marks an area, perhaps not the limit, where the court-martial is appropriate and permissible. What lies between is for decision at another time.

VII
Having reached this result on the court-martial issue, the additional issue that the parties have argued, of O'Callahan's retrospectivity, need not be decided. See Alabama State Federation of Labor v. McAdory, 325 *370 U. S. 450, 461 (1945). We recognize that the retroactivity question has important dimensions, both direct and collateral, and that the Government strongly urges that the question be decided here and now. We have concluded, however, that the issue is better resolved in other litigation where, perhaps, it would be solely dispositive of the case. We take some comfort in the hope that the present decision should eliminate at least some of the confusion that the parties and commentators say has emerged from O'Callahan.[14]
Affirmed.
NOTES
[1] Everett, O'Callahan v. ParkerMilestone or Millstone in Military Justice?, 1969 Duke L. J. 853; McCoy, Equal Justice for Servicemen: The Situation Before and Since O'Callahan v. Parker, 16 N. Y. L. F. 1 (1970); Nelson & Westbrook, Court-Martial Jurisdiction Over Servicemen for "Civilian" Offenses: An Analysis of O'Callahan v. Parker, 54 Minn. L. Rev. 1 (1969); Wilkinson, The Narrowing Scope of Court-Martial Jurisdiction: O'Callahan v. Parker, 9 Washburn L. J. 193 (1970); Wurtzel, O'Callahan v. Parker: Where Are We Now?, 56 A. B. A. J. 686 (1970); The Supreme Court 1968 Term, 83 Harv. L. Rev. 7, 212-220 (1969); O'Callahan v. Parker, 395 U. S. 258 (1969): New Limitation on Court-Martial Jurisdiction, 61 J. Crim. L. C. & P. S. 195 (1970); Comment, 22 Baylor L. Rev. 64 (1970); Comment, 18 J. Pub. L. 471 (1969); Comment, 21 Mercer L. Rev. 311 (1969); Comment, 7 San Diego L. Rev. 55 (1970); Comment, 15 Vill. L. Rev. 712 (1970); Comment, 21 S. C. L. Rev. 781 (1969); Note, 70 Col. L. Rev. 1262 (1970); Note, 18 Kan. L. Rev. 335 (1970); Note, 3 Loyola U. L. Rev. 188 (1970); Note, 24 U. Miami L. Rev. 399 (1970); Note, 68 Mich. L. Rev. 1016 (1970); Note, 48 N. C. L. Rev. 380 (1970); Note, 64 Nw. U. L. Rev. 930 (1970); Recent Cases, 49 Ore. L. Rev. 237 (1970); Note, 23 Sw. L. J. 948 (1969); Note, 37 Tenn. L. Rev. 421 (1970); Note, 44 Tul. L. Rev. 417 (1970); 36 Brooklyn L. Rev. 259 (1970); 19 Buffalo L. Rev. 400 (1970); 38 Geo. Wash. L. Rev. 170 (1969); 31 Ohio St. L. J. 630 (1970); 22 Vand. L. Rev. 1377 (1969).
[2] McCoy, supra; 61 J. Crim. L. C. & P. S. 195; Note, 18 Kan. L. Rev. 335; 19 Buffalo L. Rev. 400; Comment, 18 J. Pub. L. 471.
[3] Everett, supra; Nelson & Westbrook, supra; Wilkinson, supra; Wurtzel, supra; Comment, 15 Vill. L. Rev. 712; Note, 24 U. Miami L. Rev. 399; 38 Geo. Wash. L. Rev. 170; 22 Vand. L. Rev. 1377.
[4] Comment, 22 Baylor L. Rev. 64; Comment, 18 J. Pub. L. 471; Note, 18 Kan. L. Rev. 335; Note, 23 Sw. L. J. 948; Note, 24 U. Miami L. Rev. 399; 31 Ohio St. L. J. 630.
[5] Wilkinson, supra; Comment, 22 Baylor L. Rev. 64; Note, 64 Nw. U. L. Rev. 930.
[6] Nelson & Westbrook, supra; Comment, 21 S. C. L. Rev. 781; Note, 3 Loyola U. L. Rev. 188, 198 n. 67; 44 Tul. L. Rev. 417, 424.
[7] See, e. g., Latney v. Ignatius, 135 U. S. App. D. C. 65, 416 F. 2d 821 (1969); Harris v. Ciccone, 417 F. 2d 479, 488 (CA8 1969), cert. denied, 397 U. S. 1078; Gallagher v. United States, 191 Ct. Cl. 546, 423 F. 2d 1371 (1970), cert. denied, 400 U. S. 849; Silvero v. Chief of Naval Air Basic Training, 428 F. 2d 1009 (CA5 1970); King v. Moseley, 430 F. 2d 732 (CA10 1970); Zenor v. Vogt, 434 F. 2d 189 (CA5 1970).
[8] United States v. Borys, 18 U. S. C. M. A. 547, 40 C. M. R. 259 (1969); United States v. Prather, 18 U. S. C. M. A. 560, 40 C. M. R. 272 (1969); United States v. Beeker, 18 U. S. C. M. A. 563, 40 C. M. R. 275 (1969); United States v. DeRonde, 18 U. S. C. M. A. 575, 40 C. M. R. 287 (1969); United States v. Boyd, 18 U. S. C. M. A. 581, 40 C. M. R. 293 (1969); United States v. Cochran, 18 U. S. C. M. A. 588, 40 C. M. R. 300 (1969); United States v. Chandler, 18 U. S. C. M. A. 593, 40 C. M. R. 305 (1969); United States v. Crapo, 18 U. S. C. M. A. 594, 40 C. M. R. 306 (1969); United States v. Harris, 18 U. S. C. M. A. 596, 40 C. M. R. 308 (1969); United States v. Castro, 18 U. S. C. M. A. 598, 40 C. M. R. 310 (1969); United States v. Henderson, 18 U. S. C. M. A. 601, 40 C. M. R. 313 (1969); United States v. Riehle, 18 U. S. C. M. A. 603, 40 C. M. R. 315 (1969); United States v. Williams, 18 U. S. C. M. A. 605, 40 C. M. R. 317 (1969); United States v. Paxiao, 18 U. S. C. M. A. 608, 40 C. M. R. 320 (1969); United States v. Smith, 18 U. S. C. M. A. 609, 40 C. M. R. 321 (1969); United States v. Shockley, 18 U. S. C. M. A. 610, 40 C. M. R. 322 (1969); United States v. Rose, 19 U. S. C. M. A. 3, 41 C. M. R. 3 (1969); United States v. Armstrong, 19 U. S. C. M. A. 5, 41 C. M. R. 5 (1969); United States v. Rego, 19 U. S. C. M. A. 9, 41 C. M. R. 9 (1969); United States v. Camacho, 19 U. S. C. M. A. 11, 41 C. M. R. 11 (1969); United States v. Cook, 19 U. S. C. M. A. 13, 41 C. M. R. 13 (1969); United States v. Armes, 19 U. S. C. M. A. 15, 41 C. M. R. 15 (1969); United States v. Morisseau, 19 U. S. C. M. A. 17, 41 C. M. R. 17 (1969); United States v. Peak, 19 U. S. C. M. A. 19, 41 C. M. R. 19 (1969); United States v. Plamondon, 19 U. S. C. M. A. 22, 41 C. M. R. 22 (1969); United States v. Sharkey, 19 U. S. C. M. A. 26, 41 C. M. R. 26 (1969); United States v. Weinstein, 19 U. S. C. M. A. 29, 41 C. M. R. 29 (1969); United States v. Allen, 19 U. S. C. M. A. 31, 41 C. M. R. 31 (1969); United States v. Safford, 19 U. S. C. M. A. 33, 41 C. M. R. 33 (1969); United States v. Frazier, 19 U. S. C. M. A. 40, 41 C. M. R. 40 (1969); United States v. Nichols, 19 U. S. C. M. A. 43, 41 C. M. R. 43 (1969); United States v. Hallahan, 19 U. S. C. M. A. 46, 41 C. M. R. 46 (1969); United States v. Huff, 19 U. S. C. M. A. 56, 41 C. M. R. 56 (1969); United States v. Keaton, 19 U. S. C. M. A. 64, 41 C. M. R. 64 (1969); United States v. Easter, 19 U. S. C. M. A. 68, 41 C. M. R. 68 (1969); United States v. Stevenson, 19 U. S. C. M. A. 69, 41 C. M. R. 69 (1969); United States v. Everson, 19 U. S. C. M. A. 70, 41 C. M. R. 70 (1969); United States v. Fryman, 19 U. S. C. M. A. 71, 41 C. M. R. 71 (1969); United States v. Higginbotham, 19 U. S. C. M. A. 73, 41 C. M. R. 73 (1969); United States v. Adams, 19 U. S. C. M. A. 75, 41 C. M. R. 75 (1969); United States v. Wysingle, 19 U. S. C. M. A. 81, 41 C. M. R. 81 (1969); United States v. Gill, 19 U. S. C. M. A. 93, 41 C. M. R. 93 (1969); United States v. McGonigal, 19 U. S. C. M. A. 94, 41 C. M. R. 94 (1969); United States v. Fields, 19 U. S. C. M. A. 119, 41 C. M. R. 119 (1969); United States v. Bryan, 19 U. S. C. M. A. 184, 41 C. M. R. 184 (1970); United States v. Blackwell, 19 U. S. C. M. A. 196, 41 C. M. R. 196 (1970); Mercer v. Dillon, 19 U. S. C. M. A. 264, 41 C. M. R. 264 (1970); United States v. Peterson, 19 U. S. C. M. A. 319, 41 C. M. R. 319 (1970); Gosa v. United States, 19 U. S. C. M. A. 327, 41 C. M. R. 327 (1970); Wright v. United States, 19 U. S. C. M. A. 328, 41 C. M. R. 328 (1970); Hooper v. Laird, 19 U. S. C. M. A. 329, 41 C. M. R. 329 (1970); United States v. Haagenson, 19 U. S. C. M. A. 332, 41 C. M. R. 332 (1970); In re Watson, 19 U. S. C. M. A. 401, 42 C. M. R. 3 (1970); Brant v. United States, 19 U. S. C. M. A. 493, 42 C. M. R. 95 (1970); United States v. Daniels, 19 U. S. C. M. A. 529, 42 C. M. R. 131 (1970); United States v. Wills, 20 U. S. C. M. A. 8, 42 C. M. R. 200 (1970); United States v. Lovejoy, 20 U. S. C. M. A. 18, 42 C. M. R. 210 (1970); United States v. Ortiz, 20 U. S. C. M. A. 21, 42 C. M. R. 213 (1970); United States v. Hargrave, 20 U. S. C. M. A. 27, 42 C. M. R. 219 (1970); United States v. Davis, 20 U. S. C. M. A. 27, 42 C. M. R. 219 (1970); United States v. Snyder, 20 U. S. C. M. A. 102, 42 C. M. R. 294 (1970); United States v. Morley, 20 U. S. C. M. A. 179, 43 C. M. R. 19 (1970).
[9] Rape is specified in Art. 120 (a):

"§ 920. Art. 120. Rape and carnal knowledge.
"(a) Any person subject to this chapter who commits an act of sexual intercourse with a female not his wife, by force and without her consent, is guilty of rape and shall be punished by death or such other punishment as a court-martial may direct."
Kidnaping is not specifically mentioned in the Code. The charge for that offense, therefore, was laid under Art. 134, the General Article:
"§ 934. Art. 134. General article.
"Though not specifically mentioned in this chapter, all disorders and neglects to the prejudice of good order and discipline in the armed forces, all conduct of a nature to bring discredit upon the armed forces, and crimes and offenses not capital, of which persons subject to this chapter may be guilty, shall be taken cognizance of by a general, special, or summary court-martial, according to the nature and degree of the offense, and shall be punished at the discretion of that court."
[10] Now the Court of Military Review. 82 Stat. 1341, 10 U. S. C. § 866 (1964 ed., Supp. V).
[11] We are advised by the parties that Relford was released on parole on May 20, 1970.
[12] Petitioner's Brief 9.
[13] Petitioner's Reply Brief 2.
[14] The Solicitor General supplied the following data relative to selected types of offenses over which the Army assumed jurisdiction in 1967:

 Number Occurring Number Occurring
 on Military off Military
Offense Reservations Reservations
 1. Homicides 30 24
 2. Sexual crimes
 (Rape, indecent assaults, etc.) 214 105
 3. Robbery 112 44
 4. Assaults 451 160
 5. Burglary and Housebreaking 165 28
 6. Arson 24 3
 7. Larceny 1029 74
 8. Larceny of motor vehicle 221 56
 9. Narcotics offenses
 (including marihuana and
 dangerous drugs) 833 106
10. Disorderly conduct 59 22