UNITED STATES

v.

**Cadet Third Class Robert C. STEWART, FR 265–76–7964 23d Cadet Squadron, The Air Force Cadet Wing United States Air Force Academy.**

**ACM 21871.**

U. S. Air Force Court of Military Review.

Sentence Adjudged 6 June, 1975.

Decided 5 Dec. 1975.

Appearances: Appellate counsel for the Accused: Colonel Jerry E. Conner and Major Bruce R. Houston. Captain Thomas P. McMahon filed a brief on behalf of the accused. Appellate counsel for the United States: Colonel C. F. Bennett, Colonel Julius C. Ullerich, Jr., and Captain Frederick P. Waite.

## DECISION

HERMAN, Judge:

The accused, a United States Air Force Academy cadet, was convicted, consistent with his pleas of guilty, of eleven specifications of larceny and six of forgery, in violation of Articles 121 and 123, Uniform Code of Military Justice, 10 U.S.C. §§ 921, 923, by a military judge sitting as a general court-martial. He was sentenced to dismissal, confinement at hard labor for two years, and total forfeitures; the convening authority approved the sentence and suspended the confinement until 1 July 1976.

Each of the larcenies described in the specifications of Charge I consisted of the taking of a wallet and its contents, or a checkbook indicating the owner by printed name and address. The forgery specifications of Charge II allege the making of checks with intent to defraud; the checks were some of those described in Charge I. All but one of the forgeries were alleged to have been made in the city of Colorado Springs, Colorado (the evidence shows they were made in a car or a supermarket), the other at the United States Air Force Academy. The victims of the larcenies and forgeries were all fellow cadets at the Air Force Academy.

Appellate defense counsel have invited our attention to seven errors asserted on behalf of the accused by trial defense counsel, which are ably argued in his brief. Each error assigned was the subject of a motion prior to the accused's plea of guilty, or prior to final argument on sentence, as was appropriate. We shall discuss these, as we find the others adequately treated in the post-trial review and properly resolved against the accused, or without merit.

We first consider the claim that the court-martial was without subject-matter jurisdiction over the five forgeries made in Colorado Springs, argued under the principles enunciated in *O'Callahan v. Parker,* 395 U.S. 258, 89 S.Ct. 1683, 23 L.Ed.2d 291 (1969), and further explained in *Relford v. Commandant,* 401 U.S. 355, 91 S.Ct. 649, 28 L.Ed.2d 102 (1971). We decide jurisdiction was appropriately exercised under these circumstances.

The requirement for "service-connecting" circumstances to establish a military interest in an offense, instituted in the *O'Callahan* case, naturally stimulated a great deal of literature and interpretive case law shortly after its announcement. See the citations in *Relford v. Commandant, supra,* in the notes at pages 356–359, 91 S.Ct. 649.

Among these early cases, the principle was developed that there is sufficient "service-connection" in the military status of the victim in the off-base offenses of housebreaking and larceny, *United States v. Rego,* 19 U.S.C.M.A. 9, 41 C.M.R. 9 (1969), regardless of whether the accused knew that his victim was a military member. *United States v. Camacho,* 19 U.S.C.M.A. 11, 41 C.M.R. 11 (1969). Other cases upheld the exercise of court-martial jurisdiction over an off-base car theft, *United States v. Cook,* 19 U.S.C.M.A. 13, 41 C.M.R. 13 (1969), and an off-base robbery, *United States v. Plamondon,* 19 U.S.C.M.A. 22, 41 C.M.R. 22 (1969), on the basis of the victim's military status.

Where an offense committed on base provides the subject matter for a different, off-base offense, this Court has found sufficient service-connection for the exercise of jurisdiction over the off-base offense. *United States v. Rock,* 49 C.M.R. 235 (A.F. C.M.R.1974), pet. denied, 23 U.S.C.M.A. 632, —— C.M.R. ——, 23 Dec. 1974 (off-base destruction of civilian pay telephone stolen from on base); *United States v. Brown,* 44 C.M.R. 569 (A.F.C.M.R.1971), pet. denied, 44 C.M.R. 939 (1971) (off-base forgery of military paychecks stolen from a mailroom on base, the payees being service members). The United States Army Court of Military Review has taken the same view in similar cases. *United States v. Sims,* 50 C.M.R. 401 (A.C.M.R.1975); *United States v. Snyder,* No. 421134 (A.C.M.R. 21 Aug. 1969) cited in *Sims, id.* at 407.

On the other hand, the United States Court of Military Appeals has held that a court-martial is without jurisdiction to try an off-base violation of the Dyer Act, 18 U.S.C. § 2312, by transporting a known stolen vehicle across state boundaries, although the vehicle had been stolen on an Army post from another serviceman. *United States v. Wills,* 20 U.S.C.M.A. 8, 42 C.M.R. 200 (1970).[1]

▇▇▇ The early cases concerned with off-base forgeries found adequate service-connection where a military address appeared on the check with the forged indorsement, *United States v. Hallahan,* 19 U.S.C.M.A. 46, 41 C.M.R. 46 (1969), or where the person cashing the check relied upon the accused's representation that he was a serviceman, *United States v. Morisseau,* 19 U.S.C.M.A. 17, 41 C.M.R. 17 (1969). See also *United States v. Frazier,* 19 U.S.C. M.A. 40, 41 C.M.R. 40 (1969); *United States v. Sims,* supra. The essential difference between these cases and the present one is that in each of the cases cited, some form of *uttering* the instrument off-base was charged. This act of offering the instrument to a person or entity off-base necessarily raises a substantial civilian interest in the matter. It is only when the civilian community fails to rely upon the military status of the accused or some other military person or entity identified on the instrument that we can state with assurance that there are insufficient service-connecting circumstances to warrant the exercise of court-martial jurisdiction over the off-base offense. Where, as here, the charge is one solely of *making* a forged instrument, the *locus* of the physical act of the false writing becomes irrelevant,[2] taking into consideration all of the other military connections: (1) the checks were stolen on base; (2) the victims of the thefts were servicemen; (3) the victims of the false making of the checks were also the same servicemen whose names appeared thereon. Furthermore, in two of the five forgeries herein considered, the drawee bank, Air Academy

---

1. The result in future cases of a similar nature may not be certain. Although the *Wills* case specifically overruled *United States v. Swisher,* 28 C.M.R. 470 (A.B.R. 1959), pet. denied, 10 U.S.C.M.A. 699, 28 C.M.R. 414 (1959), pet. denied (for writ of habeas corpus based on a lack of court-martial jurisdiction) 19 U.S.C.M.A. 624 (1969), a United States Court of Appeals affirmed the *Swisher* basis of jurisdiction *after*

the *Wills* decision. *Swisher v. Moseley,* 442 F.2d 1331 (10th Cir. 1971).

2. "[T]he situs of the offense is certainly not the only criterion for establishing that the military has an appropriate and legitimate purpose in prosecuting an offense". *United States v. Rock,* supra, 49 C.M.R. at 236.

National Bank, was physically located on the military installation, and it could also be considered a potential victim of the forgeries. That the drawer and the drawee bank are victims is founded in the common law definition of forgery, "the fraudulent making or alteration of a writing to the prejudice of another's rights."[3] Those who were prejudiced by the making of these checks were the owners whose names appear thereon and whose signatures were falsely made, and the drawee banks *which* would ultimately suffer the losses.[4] Under these circumstances, the fact that the false writing took place off-base pales into insignificance as the military service had the only rational interest in the exercise of jurisdiction over these forgeries.[5]

Counsel next assert that a proliferation of specifications of larceny and forgery exists beyond the policy guidance set forth in paragraph 3–2, Air Force Manual 111–1 (2 July 1973), Military Justice Guide, which provides:

> Where an accused has committed a great many offenses, it is seldom necessary to charge him with every dereliction. Furthermore, alleging an excessive number of specifications serves no useful purpose and may result in an unreasonable delay in processing the case because of the unnecessary burden placed on counsel in preparing for trial on the many specifications alleged. Charging an accused with every conceivable variation of his offenses imposes an unwarranted workload at trial and at all appellate levels, and increases the possibility of error. Especially in larceny and worthless check offenses, experience has shown that the entire picture of an accused's activities

can be presented to the court through allegation and proof of a reasonable number of similar offenses.

Counsel request that seven of eleven findings in Charge I and two of the six findings in Charge II be set aside and their respective specifications dismissed.

■ Each offense alleged in Charge I involved theft of either a checkbook or a wallet and its contents, took place on one of eight distinct dates over a three-month period, and concerned a different victim. Charge II consists of six forgeries of falsely making checks at three separate locations,[6] forging three different names on two successive days.[7] Under these circumstances, we do not find the offenses alleged to be an unreasonable number of similar offenses. Furthermore, as we stated in *United States v. Dunn,* 44 C.M.R. 929 (A.F.C.M.R. 1972), pet. denied, 44 C.M.R. 939 (1972), paragraph 3–2 of Air Force Manual 111–1.

> . . . is, by its own terms, intended only as guidance. It does not require the Government to proceed to trial in all cases with only a representative selection of the possible charges against an accused even though investigation of additional charges will result in further pretrial delays.

■ In the instant case, there was no additional charge or undue delay, no unnecessary burden on counsel for preparation, and no unwarranted workload at trial or at this level caused by the manner in which the offenses were charged. This was not a case where variations of offenses were drafted; rather, separate acts on different days committed against distinct persons are

3. W. Blackstone, Commentaries * 247; 2 Wharton, Criminal Law and Procedure, Sec. 621.

4. Uniform Commercial Code, Secs. 3–404, 4–401. See also the second basis for jurisdiction in *United States v. Frazier,* supra.

5. This Court, in a memorandum opinion, recently upheld military jurisdiction in a very similar forgery case, *United States v. Uhlman,* No. S24164, 1 M.J. 419 (A.F.C.M.R.1975), and the United States Court of Military Appeals,

upon petition by the accused, granted review on this issue on 21 August 1975.

6. The checks were made at (1) The United States Air Force Academy, (2) in a car travelling between that place and Colorado Springs, Colorado, and (3) at a supermarket in Colorado Springs.

7. Five of the checks were made from 1515 to 1545 hours on 7 February 1975, and the other was made the following day.

properly alleged. In our decision today we emphasize that the cited Manual is guidance only, and we shall not disturb the judgment of a convening authority or military judge unless there exists a manifest miscarriage of justice as a result of a serious abuse of the discretion they must exercise over the manner of charging offenses.

■ In his next assignment of error, trial defense counsel raises a question of first impression to this, and, our research reveals, apparently, to all other United States military appellate courts. In Specification 3 of Charge I, the accused was charged with larceny of (among other items) an airline ticket to Michigan of a value of $188.00. At trial and on appeal, the defense has vigorously contested the value of this item, averring that it is not the face value, the amount paid for the ticket by the victim, which is controlling, but rather the intrinsic and nominal value of the paper. Although there is a paucity of authority on this issue, we are convinced that the "legitimate market value at the time and place of the theft," is the face value of the ticket. Manual for Courts-Martial, 1969 (Rev.), paragraph 200a(7). There is some early American law supporting this view, *McCarty v. State,* 1 Wash. 377, 25 P. 299 (1890); see also *Williams v. State,* 11 Ga.App. 766, 76 S.E. 72 (1912); *Patrick v. State,* 50 Tex.Cr. 496, 98 S.W. 840 (1906); 52A C.J.S. Larceny § 60(2)d (1968), but our research has failed to uncover recent interpretive cases in point. However, we need not rely solely upon the reasoning of these cases in reaching our result.

■ It is settled that the value of a stolen check, provided it has previously been placed in circulation, is its face value. *United States v. Windham,* 15 U.S.C.M.A. 523, 36 C.M.R. 21 (1965); *United States v. Buchhorn,* 15 U.S.C.M.A. 556, 36 C.M.R. 54 (1965). Blank checks may be the subjects of larceny, but their value is nominal, that is, the intrinsic value of the paper. *United*

*States v. Frost,* 22 U.S.C.M.A. 233, 46 C.M.R. 233 (1973); *United States v. Windham,* supra. Consistent with these cases is the decision by our predecessor Board of Review in *United States v. Cook,* 15 C.M.R. 622 (A.F.B.R. 1954):

> The property stolen was gasoline coupons, each exchangeable for a specified amount of gasoline at an EES (European Exchange System) gasoline station . . . upon completion of the spaces for signature and certain other information on their face. It is not necessary to show identification when using the coupons.
>
> . . .

■ In his brief, trial defense counsel argues that stolen check cases are unique in that they involve negotiable instruments. We do not view the negotiability of the documents stolen to be controlling, for we find a different, distinct, and common thread running through the cases cited above. It is the *issuance,* or the stamp of officiality, which operates to increase the value from a nominal amount to the face value or cost. Whether this be by the signature of a drawer of a negotiable instrument, or the signature or stamp of the proper clerk or official, or even the filling in of spaces by the purchaser, *it is this act of completion* which places the document "in circulation." Thus, whether checks, as illustrated by the *Windham* and *Buchhorn* cases, gasoline coupons as portrayed in *Cook,* or railroad tickets as in *McCarty,* if complete and ready for use, their face value or purchase cost will control. The fact that the victim may replace the item at little or no cost to himself does not change the value of the stolen article.[8]

■ Applying these principles to the case at bar, it is clear that the only logical value to be assigned to the airline ticket is the face value, or retail cost of $188.00. The ticket had been issued and was capable of being used, without further validation, on a flight from Colorado Springs to Michigan.

---

**8.** See *Cowan v. State,* 171 Ark. 1018, 287 S.W. 201, 48 A.L.R. 1165 (1926), in which the Arkansas Supreme Court valued stolen license plates at their cost of $16.00, although the owner could replace them for only a dollar. See also Annot., 15 A.L.R.Fed. 336 at 344–46 (1973); *People v. Irrizari,* 5 N.Y.2d 142, 182 N.Y.S.2d 361, 156 N.E.2d 69 (1959).

It is a matter of common knowledge, and we judicially note, that a seat on an aircraft may be obtained at an airport by a ticket-holder without any further identification on his part. Manual for Courts-Martial, supra, paragraph 147a; *United States v. Cook*, 2 U.S.C.M.A. 223, 8 C.M.R. 23 (1953); *United States v. Land*, 37 C.M.R. 921 (A.F.B.R. 1967); *United States v. Miner*, 33 C.M.R. 450 (A.B.R. 1963), pet. denied, 33 C.M.R. 436 (1963).

For the reasons stated, the findings of guilty and the sentence are correct in law and fact and are Affirmed.

FORAY, Judge, concurs. ROBERTS, Senior Judge, absent.