**Ronald Lee PETERSON, Petitioner,**

v.

**J.R. JOHNSON, Warden, Respondent.**

**Civ. A. No. 82–73745.**

United States District Court,
E.D. Michigan, S.D.

Aug. 25, 1983.

Ronald Lee Peterson, pro se.

Patricia G. Reeves, Asst. U.S. Atty., Detroit, Mich., for respondent.

## MEMORANDUM OPINION

FEIKENS, Chief Judge.

Petitioner, Ronald Lee Peterson, an inmate at the Federal Correctional Institution, Milan, Michigan, has filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2241. Petitioner challenges his 1980 court martial conviction for rape, contending that the military courts lacked jurisdiction. I find that the military courts exercised proper jurisdiction, and therefore deny issuance of the writ.

On August 28, 1979, petitioner was on active duty in the United States Marine Corps at Camp Pendleton, California. The unrebutted evidence adduced at trial showed that on August 28, 1979, petitioner had sexual intercourse with Mary Alice Whann, a 23-year old female who was not his wife. The prosecution evidence which convicted petitioner indicated that on that date, Mary Alice Whann accompanied her mother, her younger brother and sister and several of her mother's friends to a campsite located on the Marine Corps base at Camp Pendleton. While at the campsite, Miss Whann met petitioner and a private Brian Bushnell. In the presence of her younger sister, Miss Whann, petitioner, and Bushnell talked for an hour or longer in the campsite area. According to Miss Whann, they conversed about marine experiences and future plans. At about 10:30 p.m., petitioner asked Miss Whann to accompany him on a walk on the beach. Petitioner persuaded Miss Whann to sit with him on the sand where they began kissing and petitioner fondled her breasts. Up to this point Miss Whann willingly participated; however, when petitioner attempted to unsnap her jeans, she resisted replying, "No way, man." Using force and despite her protest, petitioner proceeded to rape Miss Whann.

Because of the pain from physical abuse, Miss Whann proceeded slowly back to the trailer camp accompanied by petitioner who struck up a conversation similar to their initial conversation. As soon as they approached the campsite, Miss Whann ran and hid behind a trailer hoping to escape petitioner. She called to a Kay Moynahan who went behind the trailer to talk to her. Kay Moynahan testified that she found Miss Whann sobbing, trembling, and speaking hysterically in a shrill, tense voice. When Miss Whann entered her mother's trailer, she said, "Mom, he hurt me. He raped me." Dr. Carlos Schmidt examined her three hours later and found that she suffered lacerations on the neck, elbows and knees, and lacerations on the ends of her labia, with abrasions in the cervix. The doctor concluded that the vagina injury was caused by vigorous sexual intercourse.

On October 31, 1979, December 19, 1979, January 31, 1980, February 19, 1980, and February 20, 1980, petitioner was tried by general court martial at Camp Pendleton, California. He requested and was granted trial before a military judge who found him guilty of rape and sentenced him to confinement at hard labor for fifteen years, forfeiture of all pay and allowances, reduction to the pay grade of E-1, and dishonorable discharge. On May 14, 1980, the convening authority approved the sentence. On September 11, 1980, the United States Naval Court of Military Review affirmed the findings but reduced the sentence to ten years. On December 17, 1981, the Naval Clemency and Parole Board denied petitioner's clemency request and his request for restoration to active duty. On January 4, 1982, the United States Court of Military Appeals denied petitioner's request for review.

Petitioner seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2241, claiming that the military court which convicted him was without jurisdiction. The United States Supreme Court has held that for a military court to have jurisdiction, the crime at issue must have been "service connected."

*O'Callahan v. Parker, Warden,* 395 U.S. 258, 89 S.Ct. 1683, 23 L.Ed.2d 291 (1969). In *Relford v. Commandant, U.S. Disciplinary Barracks, Ft. Leavenworth,* 401 U.S. 355, 91 S.Ct. 649, 28 L.Ed.2d 102 (1971), the Supreme Court refined the analysis for determining whether a service connection exists. In *Relford* the petitioner kidnaped and raped two civilian women. One of the women was visiting her brother at a military base, the other was a civilian employee on the base. Both rapes took place on the base, but while petitioner was off duty and in civilian clothing. In deciding whether the criminal acts in question were service connected, the Court applied an *ad hoc* approach in which twelve factors were considered:

1. The serviceman's proper absence from the base.
2. The crime's commission away from the base.
3. Its commission at a place not under military control.
4. Its commission within our territorial limits and not in an occupied zone of a foreign country.
5. Its commission in peacetime and its being unrelated to authority stemming from the war power.
6. The absence of any connection between the defendant's military duties and the crime.
7. The victim's not being engaged in the performance of any duty relating to the military.
8. The presence and availability of a civilian court in which the case can be prosecuted.
9. The absence of any flouting of military authority.
10. The absence of any threat to a military post.
11. The absence of any violation of military property.
12. The offense's being among those traditionally prosecuted in civilian courts.

*Id.* at 365, 91 S.Ct. at 655. Based upon a weighing of these factors the Court was able to "readily conclude" that the crimes charged were triable by a military court. *Id.* at 367, 91 S.Ct. at 656. In so finding, the Court stressed:

(a) The essential and obvious interest of the military in the security of persons and of property on the military enclave....
(b) The responsibility of the military commander for maintenance of order in his command and his authority to maintain that order.... (c) The impact and adverse effect that a crime committed against a person or property on a military base, thus violating the base's very security, has upon morale, discipline, reputation and integrity of the base itself, upon its personnel and upon the military operation and the military mission. (d) The conviction that Art. I, § 8, cl. 14, vesting in the Congress the power "To make Rules for the Government and Regulation of the land and naval Forces," means, in appropriate areas beyond the purely military offense, more than the mere power to arrest a serviceman offender and turn him over to the civil authorities. The term "Regulation" itself implies, for those appropriate cases, the power to try and to punish. (e) The distinct possibility that civil courts, particularly nonfederal courts, will have less than complete interest, concern, and capacity for all the cases that vindicate the military's disciplinary authority within its own community. See W. Winthrop, Military Law and Precedents 725 (2d ed. 1896, 1920 Reprint); Wilkinson, The Narrowing Scope of Court-Martial Jurisdiction: *O'Callahan v. Parker,* 9 Washburn L.J. 193, 208 (1970). (f) The very positive implication in *O'Callahan* itself, arising from its emphasis on the absence of service-connected elements there, that the presence of factors such as geographical and military relationships have important contrary significance. (g) The recognition in *O'Callahan* that, historically, a crime against the person of one associated with the post was subject even to the General Article. The comment from Winthrop, *supra,* at 724:

"Thus such crimes as theft from or robbery of an officer, soldier, post trader, or camp-follower ... inasmuch as

they directly affect military relations and prejudice military discipline, may properly be—as they frequently have been—the subject of charges under the present Article. On the other hand, where such crimes are committed upon or against *civilians,* and not at or near a military camp or post, or in breach or violation of a military duty or order, they are not in general to be regarded as within the description of the Article, but are to be treated as civil rather than military offenses." (Footnotes omitted.)

cited both by the Court in *O'Callahan,* 395 U.S., at 274 n. 19 [89 S.Ct. at 1691 n. 19], and by the dissent at 278–279 [89 S.Ct. at 1693–1694], certainly so indicates and even goes so far as to include *an offense against a civilian committed "near" a military post.* (h) The misreading and undue restriction of *O'Callahan* if it were interpreted as confining the court-martial to the purely military offenses that have no counterpart in nonmilitary criminal law. (i) Our inability appropriately and meaningfully to draw any line between a post's strictly military areas and its nonmilitary areas, or between a serviceman-defendant's on-duty and off-duty activities and hours on the post. (Emphasis added.)

*Id.* at 367–369, 91 S.Ct. at 656–657.

In the case at hand, the facts developed indicate that petitioner and the victim met at a campground located on the Marine Corps base, Camp Pendleton, California. The victim was a lawful visitor. The subsequent rape occurred at Onofre Beach which is a parcel of land owned by the United States Government and leased to the State of California. The land is a part of Camp Pendleton and was leased to the State as a beach for general public use; however, the Federal Government retained access to the beach for a number of purposes, including the conduct of military operations. The lease was terminable by the Federal Government at any time for mobilization, national emergencies, or in the interest of national security. The State only received the right to use of the land and never obtained an actual interest in the land itself.

Petitioner argues that the fact that this crime took place on a portion of the base which was used concurrently by the military and the public serves to distinguish it from the crimes in *Relford,* which took place on the base proper. The Court of Military Appeals was presented with a similar contention in *U.S. v. Rogers,* 7 M.J. 274 (C.M.A.1979). In *Rogers,* the accused was convicted by general court martial of the rape of two females, and carnal knowledge of a third. In that case, the accused claimed the military lacked subject matter jurisdiction in that the rape occurred on the grounds of a Veterans' Administration Hospital located in Ft. Lewis, Washington. The parties stipulated that, while the hospital was located on the base, the use of the portion of land upon which the hospital rested was transferred to the Veterans' Bureau. While the Veterans' Administration was permitted to use the land, such use was reversible at will by the Secretary of War. The court in *Rogers* held that the military courts had proper jurisdiction over the matter, notwithstanding the fact that the parcel of land where the crime was committed was not in the exclusive use of the military.

As did the court in *Rogers,* I find that the fact that the land in question was in the concurrent use of military and non-military authorities did not serve to divest the military courts of their jurisdiction. The factual setting of this case is substantially identical to that in *Relford.* The fact that the beach in question was subject to use by the public as well as the military does not significantly alter the service connections which were found to exist in *Relford.* The military's interest in preserving order on that portion of the base which was in concurrent use is not different in kind from its interest in the remainder of the base. Furthermore, the statement in *Relford* that service connection goes so far as to include "an offense against a civilian committed 'near' a military post" indicates that it is not the physical boundary of the base, but the interest in preserving the integrity of the base, which is controlling. *Supra* at 368, 91 S.Ct. at 657. Here, for virtually the same reasons as enumerated in *Relford,* pe-

titioner's actions directly impacted upon military interests, and the lack of exclusive military control over the situs of the crime does not vitiate that service connection.

For these reasons, the application for writ of habeas corpus is denied. An appropriate Order and Judgment will issue.