**UNITED STATES**

v.

**Staff Sergeant Ronald P. GILLETTE,
Fr 571–23–7677, United States
Air Force.**

**ACM 25046.**

Air Force Court of Military Review.

Sentence Adjudged 28 March 1985.

Decided 12 June 1986.

Appellate Counsel for the Accused: H. Russel Halpern, Esquire, Tarzana, California 91356. Colonel Leo L. Sergi and Lieutenant Colonel Michael D. Wims.

Appellate Counsel for the United States: Colonel Kenneth R. Rengert and Captain Marc Van Nuys.

Before HODGSON, FORAY and MICHALSKI, Appellate Military Judges.

## DECISION

HODGSON, Chief Judge:

This is an appeal from a conviction for premeditated murder. The approved sentence extends to a dishonorable discharge, confinement for life, total forfeitures and reduction to airman basic. Finding no prejudicial error as to either the findings of guilty or the sentence, we affirm.

I

The appellant and the victim were married in October, 1975. In spring, 1982, he met Suyen Gutierrez who was attending a bible college in Henderson, Nevada. Suyen did not know the appellant was married and they became attracted to one another through correspondence and visits by the appellant. Ultimately, in March 1984, the appellant asked Suyen to marry him and eventually she accepted. The wedding was set for 8 September 1984, and the arrangements of the ceremony were begun in late July or early August with the wedding invitations being sent out some time during this period.

At about 0830 hours, 28 August 1984, emergency room personnel from George Air Force Base Hospital, who were responding to a call from the appellant, arrived at his on-base quarters and found Mrs. Gillette lying in bed on her back with the upper portion of her body turned to the left and a brown plastic bag tucked under her head. After attempts to revive her failed, the attending physician pronounced her dead.

In a statement given to investigators the day of the incident the appellant said he and his wife came home about 2230 hours the night before and fed themselves and the children. His wife had three mixed drinks and went to bed. However, she had trouble sleeping and he gave her two sleeping pills. The next morning he saw nothing amiss with either his wife or small son who had gotten in bed with her, and left for work. He returned about 0830 and found his wife still in bed with a plastic bag beneath her head covering her nose and mouth. He went next door to call an ambulance and returned to take his son from the bedroom.

The autopsy revealed a high level of diphenhydramine which is a generic component of over-the-counter sleeping aids such as "NYTOL." The amount of disphenhydramine in Mrs. Gillette's system would be equal to approximately 10 "NYTOL" tablets. While this dosage is not fatal, it makes a person "very, very, very sleepy and difficult to wake up." The amended autopsy protocol gave the cause of death as "disphenhydramine toxicity and suffocation, minutes to hours, with the contributing causes described as a fatty liver and cardiomyopathy."

On 8 September 1984, the appellant married Suyen Gutierrez and indicated in his marriage license that his first marriage had ended in divorce in 1982.

In a verbal statement given to law enforcement investigators on 14 November, the appellant admitted killing his wife by holding her face down on a pillow covered with a plastic bag until she quit "moving." He explained his action as the result of the "conflict with [his] agreement to marry Suyen [Gutierrez]." He related he slept with his wife until sometime between four and five A.M. when he got up and went down stairs to get a trash bag which he "smoothed" over the pillow. He rolled his wife over, pushed her face into the pillow until she wasn't "moving." He stated he wanted her to suffocate. The investigation disclosed that an alarm clock in the bedroom was set to go off at three. In addition the government established that the appellant was experiencing severe financial problems and was the beneficiary of a $29,-000 life insurance policy he carried on his wife.

At trial the appellant denied killing his wife and repudiated his pretrial confession which he contended was false. He testified that when told that Suyen was going to be questioned he was overcome with despair and hopelessness and "felt lost." It was in this frame of mind that he falsely admitted smothering his first wife.

Doctor Christopher Ebbe, a clinical psychologist, testified that it was unlikely that the appellant would commit a deliberate violent crime. Doctor Ebbe was also of the opinion that the appellant's personality made it possible for him to falsely confess to a crime he had not committed. The defense suggested that Mrs. Gillette's death was suicide.

II

The initial assigned error urges that the trial court lacked jurisdiction to hear the case as the alleged criminal conduct is not service-connected. This argument has no basis in law. Since the offense occurred at George Air Force Base, there is no question about court-martial jurisdiction over it. *Relford v. Commandant*, 401 U.S. 355, 91 S.Ct. 649, 28 L.Ed.2d 102 (1971); *United States v. Scott*, 21 M.J. 345 (C.M.A.1986).

III

Special Agent James K. Poorman is a forensic consultant with the Office of Special Investigations (OSI) in the field of fingerprint identification and analysis. Poorman stated that body surfaces, i.e., fingers, palms and ears give off oils and perspiration and leave a latent impression that is

not readily visible to the eye. To "lift" a fingerprint from the surface where it is found to a medium from which is can be more easily examined involves a variety of techniques, chemical and mechanical. Chemical techniques are more commonly used and are divided generally into two categories: 1) iodine and cyanoacrylate fuming, or 2) dusting with silver nitrate. The surface, i.e., porous or non-porous, where the print is discovered determines which technique is best.

Using procedures generally accepted in fingerprint identification on a brown plastic bag found in the appellant's bedroom, Poorman obtained a configuration on the bag that had the characteristics of a face. In his opinion the general outline was that of an eye, nose and an "apparent mouth." He offered no opinion as to the identity of the person represented by the "faceprint." Over defense objection, the trial judge permitted Poorman to relate to the members the circumstances just recited.

The appellant argues that Poorman's area of expertise, i.e., "faceprint identification" has not gained general acceptance in forensic criminal investigations and therefore does not meet the standard enunciated in *Frye v. United States*, 293 F. 1013 (D.C. Cir.1923). Accordingly, his testimony should have been excluded. Further, Poorman was not qualified to offer an expert opinion in this case.

In *United States v. Mustafa*, 22 M.J. 165 (C.M.A.1986), the Court of Military Appeals concluded that Mil.R.Evid. 702 and its parent, Federal Rule of Evidence 702, create a lower threshold for deciding whether an individual is an expert and requires only that the profered witness have some specialized knowledge as a result of experience or education. The touchstone is whether the testimony would be helpful to factfinders. *United States v. Mustafa, supra; see United States v. Collins*, 559 F.2d 561 (9th Cir.), *cert. denied*, 434 U.S. 907, 98 S.Ct. 309, 54 L.Ed.2d 195 (1977).

The forensic fingerprint techniques used by Poorman to obtain the "faceprint" are well established in the scientific community. It should be also remembered that he voiced no conclusion as to whom the "faceprint" belonged. He merely maintained that the plastic bag appeared to have an outline containing facial features. At trial it was uncontraverted that the victim was found in her bedroom with a brown plastic bag under her face. In a statement given the day of the incident, the appellant acknowledged he found his wife in bed with the bag under her head covering her nose and mouth. The medical personnel first on the scene also described the victim's condition in this manner. When viewed in this perspective Poorman's testimony that the plastic bag came into contact with a human face was cumulative of other evidence before the court.

■ In our view Poorman's specialized knowledge in criminal investigation techniques would be of assistance to the factfinders. Accordingly, the trial judge did not err in permitting him to testify. *United States v. Mustafa, supra.* Our opinion is limited to the facts of this case. We do not decide if a "faceprint" has sufficient scientific acceptance to be admissible in the same manner as finger and palm prints or as handwriting or voice analysis which are admitted as conclusive proof of identity. On this issue we reserve judgment.

## IV

The main thrust of the defense's case was that the appellant's earlier oral admission of killing his wife was false and the result of the intense emotional strain he was undergoing. This assertion was bolstered by the testimony of Doctor Ebbe, a civilian psychologist, who, after examining the appellant, concluded that, 1) the appellant was not the type to commit a deliberate, violent crime, and 2) his personality was consistent with a person who could falsely confess to a crime he did not commit. It was Doctor Ebbe's premise that the false confession was the result of the appellant thinking that "his life was worthless" and he had "given up all hope." He acknowledged, however, he knew nothing about the circumstances surrounding the pretrial statement. During cross-examination and over the defense objection, the trial counsel asked Doctor Ebbe:

Q: Did you know that [the appellant] wanted to cooperate, but indicated to them he wanted to talk to a lawyer first? Are you aware of that fact?

After the Government briefly explored this area, defense counsel moved for a mistrial which was denied.

On appeal the appellant argues that it was improper to bring to the attention of the triers of fact that an accused, upon being questioned prior to trial, asserted his right to counsel. *United States v. Moore,* 1 M.J. 390 (C.M.A.1976). He further contends that the error is of constitutional dimension that requires setting aside his conviction.

The appellant's claim of error must be examined in light of what preceded the question. First, before appellant requested a lawyer he had made a statement incriminating himself in his wife's death. Second, defense counsel told the members during his opening statement that the appellant had confessed, but that the confession was not reliable due to his emotional state. The danger attending the members being told that an accused invoked his right to counsel is that they will infer guilt from his conduct. Here, since the appellant had already admitted killing his wife, his terminating the interview by requesting a lawyer did not create an inference of guilt—his prior confession did that.

█ We will accept, *arguendo,* that the trial judge erred by permitting the question to be asked. We acknowledge that specific evidence of prejudice is not required to compel reversal based on Constiutional error. *United States v. Moore, supra.* Further, before such error can be declared harmless, we must be able to declare a belief that it was harmless beyond a reasonable doubt. *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); *United States v. Moore, supra; United States v. Harris,* 14 M.J. 728 (A.F.C.M.R.1982).

█ The record shows that the appellant had the motive and the opportunity to commit the crime. This coupled with the forensic evidence together with his admission of guilt, albeit retracted at trial, amounts to overwhelming proof of guilt. Applying the exacting standard discussed above to the case before us, we find that the erroneous reference to the appellant's exercise of his right to counsel *after* he confessed did not contribute to his conviction. *See United States v. Johnstone,* 5 M.J. 744 (A.F.C.M.R.1978); *aff'd* 11 M.J. 88 (C.M.A.1981).

V

█ The appellant next urges that the Government failed to prove that his pretrial statement was voluntary. Involuntary pretrial statements made by an accused are inadmissible as evidence of guilt. Mil.R. Evid. 304(a). An involuntary statement is one "obtained ... through the use of coercion, unlawful influence or unlawful inducement." Mil.R.Evid. 304(c)(3). The issue before us is whether the trial judge erred in finding that the appellant's statement was not unlawfully coerced, influenced or induced by his interviewers, and this is primarily a factual determination to be decided, in part, on the witnesses who testified on the suppression motion. *United States v. Schuring,* 16 M.J. 664 (A.C.M.R.1983). The trial judge, who saw and heard the witnesses is, of course, in the best position to evaluate their credibility. By denying the motion, he found that the appellant was not worthy of belief and police investigators were. We find nothing in the record of trial to warrant setting aside his ruling. *United States v. Perez,* 15 M.J. 585 (A.C.M.R.1983).

VI

The remaining assigned errors, including those addressed by the appellant in his correspondence to the Court, have been examined and found to be without merit.

For the reasons stated the findings of guilty and the sentence are

AFFIRMED.

Senior Judge FORAY and Judge MICHALSKI concur.