UNITED STATES

v.

Specialist Four Antonio VALLES–SAN-
TANA, 143–44–8936, US Army, Company
D, 39th Engineer Battalion (Combat),
Fort Dix, New Jersey.

CM 433544.

U. S. Army Court of Military Review.

Sentence Adjudged 8 May 1975.

Decided 18 Nov. 1976.

Appellate Counsel for the Accused: CPT
John C. Carr, JAGC; COL Alton H. Har-
vey, JAGC.

Appellate Counsel for the United States:
CPT Keith H. Jung, JAGC; CPT John F.
DePue, JAGC; MAJ John T. Sherwood, Jr.,
JAGC; LTC Donald W. Hansen, JAGC.

## DECISION ON FURTHER REVIEW

DeFORD, Judge:

The appellant, contrary to his pleas, was convicted by a military judge sitting as a general court-martial of possession and sale of lysergic acid diethylamide on three occasions in violation of Article 134, Uniform Code of Military Justice (10 U.S.C. § 934) and received the approved sentence set forth above.

In our initial review of this case, we affirmed the findings of guilty and the approved sentence set forth above. However, on 4 March 1976, the United States Court of Military Appeals vacated our decision and remanded the record of trial to this Court with directions to hold further proceedings in abeyance pending that Court's decision in *United States v. McCarthy*, No. 30,560 then pending before that Court. *United States v. McCarthy*, 2 M.J. 26 (24 September 1976) has now been decided and we are at liberty to proceed with the determination of whether the original court-martial had jurisdiction over Charge I and its six specifications.

The operative facts with which we are concerned are as follows: The first region of the Criminal Investigation Command (CID) was conducting covert operations against military personnel who were selling prohibited drug substances in the vicinity of Fort Dix, New Jersey during October and November 1974. Three CID agents disguised as civilians, engaged a civilian by the name of James Murray, who was a known drug trafficker, to make the initial contacts. For each sale consummated, the contact received ten percent of the purchase price paid for the illicit drugs. The contact was being used as an informer although the individual concerned was not aware he was associated with CID agents. This covert operation and others were coordinated with local law enforcement agencies.

On 20 November 1974, the local contact Murray made an arrangement with a Private First Class Carr to contact the appellant to set up a sale. Carr advised Murray to have his principals meet at a barracks in the 5th Brigade Area on the reservation at Fort Dix, New Jersey at 1630 hours. Private Carr, James Murray, and Agents Chiofolo and Kimberlin arrived at the barracks area. Shortly thereafter, the accused in uniform arrived. Chiofolo, Carr, and the accused entered a barracks room at which time the accused agreed to sell to Chiofolo 200 "hits" of LSD for the sum of $500.00. The accused instructed Chiofolo to meet him in the parking lot of a night club in nearby Springfield Township, New Jersey later that evening. At the appropriate time, the parties met at the appointed place. Agents Chiofolo and Kimberlin entered the appellant's van. The appellant, Carr and an unidentified person were present in uniform in the van and the appellant gave Chiofolo two strips of paper each containing 100 hits of LSD. Upon examination, Agent Chiofolo directed Agent Kimberlin to pay the agreed $500.00 purchase price to the appellant.

Subsequently, on 23 November 1974, the agents proceeded to the home of the contact Murray in Mount Holly, New Jersey, presumably based upon information that an additional purchase could be made. Upon arrival, they found the appellant sitting in his vehicle in front of Murray's house. The parties entered the house and the appellant offered to sell an additional 200 hits of LSD for $450.00. The agents agreed to the purchase and the appellant returned to his vehicle and removed a record album from which he removed two pieces of paper containing the illicit LSD and the sale was consummated.

On 26 November 1974, an additional purchase was negotiated through the contact Murray. The parties met again at the night club parking lot in Springfield Township. Agents Chiofolo and Kimberlin and one other entered the appellant's parked automobile. The appellant then drove away from the parking lot proceeding from a quarter to half mile down Highway 620. During this movement the appellant sold three pieces of paper each containing 100 "hits" of LSD to the agents for $650.00.

The appellant was subsequently apprehended on 20 January 1975 at his quarters on the Fort Dix military reservation and was ultimately charged with possession and sale of LSD on the three occasions set forth above in violation of 21 U.S.C. § 844(a) as assimilated under Article 134, U.C.M.J. These offenses constitute the specifications of Charge I which are in issue before us.

Appellate defense counsel urge us to dismiss the charge and its specifications as the purported sales took place off post in Springfield Township, New Jersey and are therefore not "service connected." Government counsel on the other hand urge that the purported sales had sufficient "service connection" to justify court-martial jurisdiction.

In *O'Callahan v. Parker,*[1] the Supreme Court of the United States mandated that in order that a crime to be under military jurisdiction it must be "service connected," lest "cases arising in the land or naval forces, or in the militia, when in actual service in time of war or public danger," as used in the Fifth Amendment be expanded to deprive every member of the armed services of the benefits of an indictment by grand jury and a trial by a jury of his peers.

In *Relford v. Commandant,*[2] the Supreme Court extracted from their *O'Callahan* decision a 12-part test to be used on an *ad hoc* case-by-case basis for determining whether an offense was service connected.[3] In *Relford, supra,* the Supreme Court stressed nine additional considerations.[4] The Court

---

1. *O'Callahan v. Parker,* 395 U.S. 258, 89 S.Ct. 1683, 23 L.Ed.2d 291 (1969).

2. *Relford v. Commandant,* 401 U.S. 355, 91 S.Ct. 649, 28 L.Ed.2d 102 (1971).

3. The Court stated that it stressed seriatim what is thus emphasized in the *O'Callahan* holding:
    1. The serviceman's proper absence from the base.
    2. The crime's commission away from the base.
    3. Its commission at a place not under military control.
    4. Its commission within our territorial limits and not in an occupied zone of a foreign country.
    5. Its commission in peacetime and its being unrelated to authority stemming from the war power.
    6. The absence of any connection between the defendant's military duties and the crime.
    7. The victim's not being engaged in the performance of any duty relating to the military.
    8. The presence and availability of a civilian court in which the case can be prosecuted.
    9. The absence of any flouting of military authority.
    10. The absence of any threat to a military post.
    11. The absence of any violation of military property. One might add still another factor implicit in the others:
    12. The offense's being among those traditionally prosecuted in civilian courts.

4. "We stress: (a) The essential and obvious interest of the military in the security of persons and of property on the military enclave. . . . (b) The responsibility of the military commander for maintenance of order in his command and his authority to maintain that order. . . . (c) The impact and adverse effect that a crime committed against a person or property on a military base, thus violating the base's very security, has upon morale, discipline, reputation and integrity of the base itself, upon its personnel and upon the military operation and the military mission. (d) The conviction that . . . the power 'To make Rules for the Government and Regulation of the land and naval Forces,' means, in appropriate areas beyond the purely military offense, more than the mere power to arrest a serviceman offender and turn him over to the civil authorities. The term 'Regulation' itself implies, for those appropriate cases, the power to try and to punish. (e) The distinct possibility that civil courts, particularly nonfederal courts, will have less than complete interest, concern, and capacity for all the cases that vindicate the military's disciplinary authority within its own community. . . . (f) The very positive implication in *O'Callahan* itself, arising from its emphasis on the absence of service-connected elements there, that the presence of factors such as geographical and military relationships have important contrary significance. (g) The recognition in *O'Callahan* that, historically, a crime against the person of one associated with the post was subject even to the General Article. . . . (h) The misreading and undue restriction of *O'Callahan* if it were interpreted as confining the court-martial to the purely military offenses that have no counterpart in nonmilitary criminal law. (i) Our inability appropriately and meaningfully to draw any line between a post's strictly military areas and its nonmilitary areas, or between a serviceman-de-

noted the implication in the *O'Callahan* decision, arising from its emphasis on the absence of service-connected elements there, that the presence of factors such as geographical and military relationships have important contrary significance.[5] In *Schlesinger v. Councilman*, 420 U.S. 738, 95 S.Ct. 1300, 43 L.Ed.2d 591 (1975), the Supreme Court of the United States stated concerning the matter of jurisdiction of military courts, "The issue requires careful balancing of the *Relford* factors to determine whether the military interest in deterring the offense is distinct from and greater than that of civilian society, and whether the distinct military interest can be vindicated adequately in the civilian courts."

█ It is therefore apparent that the Supreme Court refused to draw specific lines of demarcation as to what is or what is not an offense cognizable under military jurisdiction. In addition, it appears that the geographical boundary of a military post, camp or station will not necessarily limit military jurisdiction when offenses are committed at or near such installation and otherwise detrimentally impact upon the enumerated criteria which favor military jurisdiction cited by the Supreme Court of the United States in *O'Callahan* and *Relford, supra*.[6]

Traditionally, the military courts have held that the use of marijuana and narcotics by military personnel, on or off a military post, camp or station has special military significance as such use has disastrous effects on the health, morale and fitness for duty of persons in the armed forces. As a result, the circumstances of no military significance described in *O'Callahan* as an es-

sential condition for the limitation of court-martial jurisdiction were not previously to be considered present.[7]

However, the effect of *Beeker, supra,* was severely limited by the United States Court of Military Appeals in *United States v. McCarthy*.[8] In that case the Court was faced with the issue of determining whether military jurisdiction existed where the transfer of three pounds of marijuana by one soldier to another occurred just outside of a post gate at Fort Campbell, Kentucky.

The court there concluded jurisdiction could not be predicated solely on military status of the wrongdoer and the victim but, rather, a detailed analysis of the facts under the criteria enunciated in *Relford, supra* was required. Finding jurisdiction, the Court balanced the *Relford* factors which indicated military jurisdiction and those not favoring such jurisdiction. In dicta, the court noted that the case was materially different from that in which an off-duty soldier commits a drug offense while blended into the general civilian populace.

Turning to the case before us, we believe that we must separate the factual events into the three separate transactions.

█ With regard to the events which occurred on 21 November 1975 and which constituted Specifications 1 and 2 of Charge I, we find criteria 1, 6, 9 and 10 favor military jurisdiction over these specification.

Here, the appellant was in a "duty status" on the afternoon of 21 November 1975 when he met with the undercover agents and entered into the agreement to sell the

---

fendant's on-duty and off-duty activities and hours on the post. (at pages 367–369, 91 S.Ct. at pages 656–657)."

5. The Court noted the comment at page 724 from Winthrop's Military Law and Precedent (1920), "Thus such crimes as theft from or robbery of an officer, soldier, post trader, or camp follower . . . inasmuch as they directly affect military relations and prejudice military discipline may properly be—as they frequently have been—the subject of charges under the present article. On the other hand where such crimes are committed upon or

against civilians, and are not at or near a military camp or post or violation of a military duty or order, they are not in general to be regarded as within the description of the article, but are to be treated as civil rather than military offenses."

6. *See United States v. McCarthy, supra.*

7. *United States v. Beeker,* 18 U.S.C.M.A. 563, 40 C.M.R. 275 (1969) and its progeny.

8. *United States v. McCarthy, supra.*

200 "hits" of LSD. The negotiations were conducted within the military reservation and inside a military barracks used as living quarters for trainees. Thus the formation of the criminal intent occurred within the confines of the military reservation.

The military duties of the appellant and the associations made therein constituted the avenues by which the appellant and Agent Chiofolo were placed in contact with each other on that date. Although the part that Private First Class Carr played in the transaction is not ascertainable, it is sufficient for this purpose to infer that Carr and the appellant were soldiers who had become acquainted by reason of their military service, thus Agent Chiofolo's referral to the appellant through Carr was the direct and proximate result of this military relationship.

Sale, transfer, introduction and possession of LSD is prohibited by Army regulations.[9] The well known attributes of the hallucinogenic drug LSD generally constitute a material threat to the health, morale, and welfare of individuals as well as the public at large.

The fact that the government agents represented themselves as drug dealers and the transfer actually took place a short distance away from the post nevertheless constitutes a threat to the post when a large amount of harmful drugs are sought to be sold and placed in circulation at or near the military post, camp, or station.[10] Especially is this true where the post is processing basic trainees such as was the case at Fort Dix at this particular time.

Examination of these criteria lead us to conclude that the foregoing factors were sufficient to vest the court-martial with jurisdiction over Specifications 1 and 2 of Charge I.

As noted in *McCarthy, supra,* the military interest in this case is pervasive. While we do not question that the Courts of the State of New Jersey were open and these offenses were therein cognizable, we do believe that here the military interest was paramount. Drug pushers have little regard or morality concerning their consumers as the profit motive is always supreme. Fort Dix, New Jersey is a part of the Army's Training Command. The military commander at Fort Dix had every interest

---

9. *See* Change 2, AR 600–50.

10. In *United States v. Blancuzzi,* 46 C.M.R. 922 (N.C.M.R.1972) cited by appellate defense counsel in their brief, the Navy Court of Military Review in considering an issue concerning "service connection" under the *O'Callahan* rule held that where an accused was charged with delivery of LSD and in fact the accused sold LSD to an undercover CID agent at a parking lot of a coffee shop in La Habra, California and such facts were stipulated at trial, military jurisdiction was lacking as there was no service connection. The Court then stated, "service connection in the case of delivery or *sale* of a prohibited drug off base in the civilian community stems from the fact that the accused in selling the drug serves as a conduit for the *unlawful possession by another* service member with its concomitant deleterious effect on the health, morale, and fitness for duty of persons in the armed forces. *United States v. Rose,* supra. In the case sub judice since the sale was made to a *CID agent,* . . . *it cannot be said that the latter's possession as a result of the sale was 'unlawful' or that it adversely affected the health, morale or fitness of that agent.* Absent these ingredients the 'service connection' link is missing and court-

martial jurisdiction is lacking." (Emphasis supplied).

While that Court undoubtedly correct with regard to a charge of "delivery," we believe that the foregoing opinion is misplaced insofar as it relies upon *United States v. Rose,* 19 U.S.C.M.A. 3, 41 C.M.R. 3 (1969) as authority for the underlined statement with regard to the sale of prohibited substances. The underlying Congressional interest undoubtedly desired to limit further distribution. However, the fact that a pusher sells to an undercover police officer and thus unknowingly avoids the distribution sought to be prohibited by the law prohibiting sale does in no way preclude his responsibility for his act of sale. It is the sale that is unlawful although unlawful possession may consequently follow. The practical effect of the foregoing rule is to prohibit law enforcement agents from using an effective tool in discovering criminal acts. Insofar as that opinion precludes the consideration of evidence of an undercover police officer's act of purchasing prohibited drug substances from military pushers as an element to be considered under the criteria set forth in *Relford, supra,* we decline to follow it.

in protecting his personnel. The conspiratorial plot to sell the prohibited substance was originated on post among soldiers in uniform. It was reasonably foreseeable that the ultimate consumers of these drugs would or could include soldiers assigned to that command. We believe that under these circumstances, the military's interest in prosecution was superior to that of the local community.

Examining the factual background upon which the remaining specifications are based in light of the *Relford* criteria, we find that none of the criteria support a determination of "service connection." Accordingly, these specifications must be dismissed as the court lacked jurisdiction to try them.

The findings of guilty of Specifications 3, 4, 5 and 6 of Charge I are set aside and those specifications are dismissed. The remaining findings of guilty are affirmed. Reassessing the sentence on the basis of the above-indicated error and the entire record, the Court affirms only so much of the sentence as provides for a bad-conduct discharge, confinement at hard labor for eight months, forfeiture of $200.00 pay per month for eight months, and reduction to the grade of Private E–1.

Judge DRIBBEN, concurs.

COOK, Senior Judge, concurring in the result:

I concur in the result. Like the majority, I find sufficient "service connection," as that term is defined in *O'Callahan v. Parker*, 395 U.S. 258, 89 S.Ct. 1683, 23 L.Ed.2d 291 (1969) and *Relford v. Commandant*, 401 U.S. 355, 91 S.Ct. 649, 28 L.Ed.2d 102 (1971), only as to appellant's criminal acts on 21 November 1974.

My reluctance to concur outright is hinged on the principal opinion's treatment of *United States v. Blancuzzi*, 46 C.M.R. 922 (N.C.M.R.1972). As I read that opinion the Navy Court of Review refused to apply in the case of an off-post drug sale to an undercover military police agent, the general rule (as exemplified by *United States v.*

*Rose*, 19 U.S.C.M.A. 3, 41 C.M.R. 3 (1969)) that an off-post sale to a serviceman was always "service connected." That Court obviously felt there had to be some showing of adverse impact on the military, a factor not necessarily always present in such a sale. As that appears to be the current view of this Court (*see United States v. Williams*, 2 M.J. 1041 (A.C.M.R. 12 November 1976) and *United States v. Edmundson*, 2 M.J. 553 (A.C.M.R. 5 November 1976)), I find no quarrel with the *Blancuzzi* decision.

Additionally, I wish to disassociate myself from any implication in the principal opinion that jurisdiction rests in this case, in whole or in part, on the theory that as this sale occurred in close proximity to Fort Dix there was some concern that the LSD sold would reappear on post. Although I recognize that in an appropriate case that is a legitimate basis upon which a "service connection" determination can rest (*see United States v. McCarthy*, 2 M.J. 26 (24 September 1976)) the facts in this case do not provide such a basis.