**Frank D. WIMBERLEY, Petitioner-Appellant,**

v.

**Melvin LAIRD, Secretary of Defense, et al., Respondents-Appellees.**

**No. 71–1810.**

United States Court of Appeals, Seventh Circuit.

Argued Dec. 12, 1972.

Decided Jan. 26, 1973.

Marc R. Kadish, Chicago, Ill., Daniel H. Benson, Lubbock, Tex., for petitioner-appellant.

Henry A. Schwarz, U. S. Atty., E. St. Louis, Ill., Edward C. Newton, Office of the Judge Advocate General, Department of the Army, Washington, D. C., for respondents-appellees.

Before FAIRCHILD, PELL and STEVENS, Circuit Judges.

STEVENS, Circuit Judge.

On February 27, 1963, an Army general court-martial found petitioner guilty of the premeditated murder of a German civilian woman in violation of 10 U.S.C. § 918(1), and sentenced him to death. On review, the sentence was reduced to life imprisonment; he is now confined in the Federal Penitentiary at Marion, Illinois. After exhausting his military appeals, petitioner attacked the military judgment collaterally. He now appeals from the district court's denial of a writ of habeas corpus contending (1) that the military tribunal had no jurisdiction to try him for murder because his offense was not "service connected," *cf.* O'Callahan v. Parker, 395 U.S. 258, 89 S.Ct. 1683, 23 L.Ed.2d 291; and (2) that his appointed counsel, who failed to raise his sole meritorious defense, was so ineffective that he did not receive a fair trial.

I.

The basic facts are not in dispute. On November 17, 1962, petitioner killed the proprietress of the Gasthaus Sonne in Ludwigsburg, Germany, by stabbing her with a knife. Petitioner was then a sergeant in the United States Army on active duty in the Federal Republic of Germany. At the time of the offense he was not performing any military assignment, was not on a military post, and was not in uniform. His victim was a German civilian who had no connection with the United States Army or any agency of the United States Government. Insofar as the jurisdictional issue is concerned, the only relevant dif-

ference between petitioner's offense and the crime involved in O'Callahan v. Parker, 395 U.S. 258, 89 S.Ct. 1683, 23 L. Ed.2d 291, is that it transgressed the laws of a foreign sovereign, whereas O'Callahan's violated the law of an American Territory.[1]

O'Callahan seems to hold that the power delegated to Congress by Article I, § 8, clause 14 of the Constitution to "makes Rules for the Government and Regulation of the land and naval Forces" does not encompass any power to authorize punishment of soldiers for misconduct which is not "service connected."[2] Logically, that holding would seem to apply here. The court construed the exemption from the Fifth Amendment for "cases arising in the land or naval forces" as though it were a limitation on the congressional rule-making power for the Armed Forces. It reasoned that a case does not arise in the Armed Forces merely by reason of the defendant's status as a soldier; the conduct itself must also be "service con-

nected." Petitioner forcefully contends that his misconduct had no more connection to his duties as a serviceman than did O'Callahan's.

Respondent argues, however, that the O'Callahan holding should not be followed here because its underlying rationale is inapplicable. The "constitutional stakes" in O'Callahan were the claimed right to indictment by a grand jury and trial by a petit jury in a civilian court. 395 U.S. at 296, 89 S.Ct. 1683.[3] Those constitutional protections are not in any event available in cases involving the violation of foreign law; and, therefore, O'Callahan's purpose to provide greater protection to members of the Armed Forces would not be served, and might well be defeated, if the holding were extended to such cases. Although respondent's argument is by no means compelling,[4] we think he fairly reads the O'Callahan opinion as being limited to offenses "committed within our territorial limits," and "not in the occupied zone of a foreign country."

---

1. Except for the fourth item in Mr. Justice Blackmun's 12-point list, all of the controlling factors in O'Callahan apply to petitioner. See Relford v. United States Disciplinary Commandant, 401 U.S. 355, 365, 91 S.Ct. 649, 28 L.Ed.2d 102.

2. At page 272 of the 395 U.S., at page 1690 of the 89 S.Ct., the court concluded "that the crime to be under military jurisdiction must be service connected," and at page 274, 89 S.Ct. at page 1692 stated: "We have accordingly decided that since petitioner's crimes were not service connected, he could not be tried by court-martial but rather was entitled to trial by the civilian courts." See also United States ex rel. Flemings v. Chaffee, 458 F.2d 544, 549–550 (2d Cir. 1972).

3. "Clearly then, grand and petit jury protections were the core rights sought to be vouchsafed." Gosa v. Mayden, 450 F.2d 753, 756 (5th Cir. 1971).

4. The O'Callahan holding seems to assume that a serviceman on trial for a civilian offense would perforce prefer trial by a local jury over trial before a military tribunal—that the danger of "command influence" is greater than the risk of adverse local prejudice against the visit-

ing soldier. In contrast, respondent seems to assume that there is greater risk of unfair treatment before a foreign tribunal than in a military trial. Petitioner rejoins that murder is not a capital offense in Germany, but the court-martial imposed a death sentence. Logically, of course, these conflicting policy considerations should not determine the boundaries of the constitutional delegation of rule-making power to Congress. If, as O'Callahan can be interpreted as holding, "service connection" is a jurisdictional requirement which must be met to authorize military discipline, it is anomalous to assume that the Army has a lesser interest in punishing an assault against an Hawaiian than one against a German. Put somewhat differently, it seems anomalous to determine the scope of the power of Congress by the nature of the alternative civilian remedy which is available. Nevertheless, in view of the force of Mr. Justice Harlan's dissent, the care with which the majority opinion narrowly limited the O'Callahan holding, and the Court's own characterization of its approach as "ad hoc," we have concluded that the Supreme Court is not likely to extend O'Callahan to its logical limit.

395 U.S. at 273–274, 89 S.Ct. at 1691.[5] Moreover, in Relford v. United States Disciplinary Commandant, the Supreme Court repeatedly stressed the fact that O'Callahan's offense had been committed on "American Territory," see 401 U.S. at 356, 364, 365, 91 S.Ct. 649, and unanimously construed *O'Callahan* as requiring an "ad hoc," rather than a logical, approach to the jurisdictional issue. See 401 U.S. at 365–366, 91 S.Ct. 649, We therefore hold that the fact that petitioner was present in Germany as a result of his status as a member of the United States Army provided a suffi‑ cient "connection" between his offense and his service status to characterize his crime as "arising in the land or naval forces" within the meaning of the Fifth Amendment.

## II.

Petitioner contends that the incompetence of his trial counsel is demonstrated by the failure to assert a defense of insanity or to offer any evidence in mitigation before the death sentence was imposed. The record discloses, however, that counsel did seriously investigate the insanity issue; [6] the extensive psychiatric evidence that he assembled in advance of trial persuasively indicates that such a defense would not have been successful.[7]

It is true that two qualified civilian psychiatrists subsequently evaluated the medical history assembled by the army psychiatrists and expressed opinions indicating that petitioner was not legally sane at the time of the offense.[8] These

5. See comment in 83 Harv.L.R. at p. 219 which describes the question of primary importance as "whether any American civil court can take jurisdiction."

6. The record reveals that petitioner was hospitalized at counsel's request from January 30 through February 11, 1963, for the purpose of making an extensive psychiatric evaluation. The 11-page report of that evaluation contains a detailed medical history of petitioner, including the results of two prior examinations in which psychiatrists had recommended his discharge from service. The evaluating psychiatrists concluded that he was legally sane.

   Moreover, counsel corresponded with petitioner's mother, seeking the names of doctors who had treated petitioner before he entered service and further information about his civilian background. In addition, he obtained hospital records relating to petitioner's treatment in 1960 and information from petitioner's sister regarding his earlier treatment and childhood.

7. "1. A careful review of all facts as well as a thorough evaluation at this time do not give any evidence of neurological or psychiatric disease.

   2. There is no evidence of physical or mental disease to warrant the disposition of this case through medical channels.

   "3. In view of these findings, it can be stated that the acts charged were not the product of mental illness, disease or defect.

   "4. At the time of the alleged acts, this soldier was so far free from mental disease, defect or derangement, as concerning the particular acts charged, to know right from wrong and to adhere to the right.

   "5. At this time this soldier is free from mental disease, defect or derangement and he possesses sufficient mental capacity to understand the nature of any Board proceedings and to conduct and cooperate intelligently in his own behalf.

   "6. In view of these findings, it can be stated that, regarding the acts charged, this soldier was capable of forming intent." Report of Psychiatric Evaluation at 2 (February 9, 1963).

8. Dr. Joseph Satten's report stated in part:

   "Question: Did the mental defect, disease or derangement that he had deprive him completely of the power of choice or volition so that he was unable, concerning the particular act charged, to adhere to the right?

   "Answer: Again concluding that the act took place during a temporary period of acute, irrational, violent behavior during which his will was overthrown and his thinking processes short-circuited, it is my opinion that, at the time of the offense, he was deprived completely of the power of choice over his behavior and he was therefore unable, concerning the particular act charged, to adhere to the right. Since I do feel his thinking processes and controls were completely overthrown at that time, I have no hesitation in saying that, at the time of the offense, he lacked substantial capacity to appreciate

opinions tend to prove that the defense would have been meritorious, but they do not establish trial counsel's incompetence. Even if those opinions had been in the trial record, it is not unlikely that the military tribunal would have attached greater weight to the consistent conclusions of the five army psychiatrists, three of whom personally examined petitioner, than to the two later opinions based only on the medical history.

On the basis of the record then available, counsel's decision to use testimony of a psychiatrist in support of a claim that petitioner was incapable of premeditated murder, rather than insane in the legal sense, cannot fairly be criticized. We recognize, as petitioner argues, that an even more detailed investigation might have turned up additional evidence; but even taking into consideration the fact that a capital offense was involved, our review of the record persuades us that counsel's trial preparation was both diligent and professional.

The factors which actually motivated counsel's decision to offer no evidence in mitigation are not available to us. There was no affirmative evidence that

this was the result of incompetence; indeed, counsel for respondent suggests several reasonable explanations for it.[9] It is sufficient for our purposes, however, simply to observe that, in light of defense counsel's ardent advocacy at earlier stages, it is reasonable to infer that silence at this point was a competent, tactical decision. The wisdom of any tactical decision cannot be judged simply by its actual consequences. In any event, petitioner was not harmed by that determination since the Board of Review reduced his sentence to the minimum allowable under the statute.[10] We are not persuaded that counsel's decision, which may or may not have been wise, establishes that petitioner's representation was constitutionally defective.

Based on a review of the record as a whole, including the lawyer's experience, general qualifications, his preparation for trial, and his vigorous conduct of the trial itself, we conclude that petitioner did receive the effective assistance of counsel mandated by the Sixth Amendment.

The judgment is

Affirmed.

the criminality of his conduct or to conform his conduct to the requirements of the law."

9. For example, respondent persuasively argues that argument or evidence in mitigation might well have been counterproductive because it would have brought significant adverse matter, not then in the record, to the court's attention.

10. The United States Court of Military Appeals approved the Board's action:

"In the last assignment of error, appellate defense counsel contend that the accused was denied due process of law because, at trial, defense counsel failed to present any evidence in mitigation and offered no argument against the death sentence. For three days, defense counsel represented the accused with competence and vigor. Time and again, he presented multiple objections to exhibits and testimony damaging to the accused. As the board of review observed, he waged 'a hard fought, hotly contested' case up to the findings. But, except for some incidental comments, defense counsel was unaccounta-

bly silent during the sentence proceedings. He offered no evidence in mitigation; and he presented no argument as to the sentence, even though trial counsel demanded the death penalty.

"In this unusual and ambiguous situation, the law officer should have had an out-of-court conference to determine, if possible, the reasons for defense counsel's silence at this critical time. The board of review considered several possible explanations, some militating against the accused. However, it resolved all doubts in the accused's favor. That decision was correct. It observed that by law the court-martial could adjudge only death or life imprisonment for premeditated murder. Article 118, Uniform Code of Military Justice, 10 U.S.C. § 918. It then reviewed 'all of the circumstances of the case' and concluded that only the lesser punishment should be affirmed. This action removed all risk of prejudice resulting from the alleged deficiency in defense counsel's representation of the accused in the sentence proceedings." United States v. Wimberley, 16 U.S.C.M.A. 3, 13 (1966).