Gary A. HENDRIX

v.

The UNITED STATES.

No. 306–75.

United States Court of Claims.

May 18, 1977.

Luther C. West, Baltimore, Md., attorney of record, for plaintiff.

Alan L. Ferber, Washington, D.C., with whom was Acting Asst. Atty. Gen., Irving Jaffe, New York City, for defendant.

Before COWEN, Senior Judge, DAVIS, Judge, and SKELTON, Senior Judge.

ON PLAINTIFF'S MOTION FOR SUM-
MARY JUDGMENT AND DEFEND-
ANT'S CROSS-MOTION FOR SUM-
MARY JUDGMENT

DAVIS, Judge:

Plaintiff Gary Hendrix served with the United States Marine Corps as a Lance Corporal in the Republic of Vietnam. On May 19, 1971, he was convicted by a general court-martial of aggravated assault, attempted murder and premeditated murder in violation of the Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 928, 880, 918. The charges against him arose from a "fragging" incident—he was convicted of having thrown fragmentation grenades into a bunker where three of his company's sergeants were sleeping, killing one and injuring the other two. His sentence was to hard labor for life, reduction to grade E-1, dishonorable discharge, and forfeiture of pay and allowances. After the convening authority reviewed and approved the findings and sentence, the Navy Court of Military Review affirmed the conviction by written opinion.[1] Plaintiff then appealed to the Court of Military Appeals, which

1. *United States v. Hendrix,* NCM 71–2473 (1972).

denied his petition for review on June 14, 1972.

At this point plaintiff had exhausted his formal appellate rights under the Uniform Code of Military Justice. Nevertheless, he filed an Article 138 Complaint of Wrongs [2] with the Secretary of the Navy. In this document, he raised objections (much like those he now brings before this court) based on an alleged deprivation of his right to effective counsel and purported lack of jurisdiction in the court-martial. The Secretary returned plaintiff's complaint on April 5, 1974, stating that the action requested was beyond his competence. In September 1974, plaintiff filed a writ of habeas corpus with the Court of Military Appeals alleging the same errors. That Court issued a memorandum opinion denying jurisdiction to entertain the writ on the ground that its authority had ended when it published its June 14, 1972 order denying plaintiff's petition for review. Subsequent to the denial of the writ, plaintiff filed this suit, requesting that he be released from confinement, granted an honorable discharge and awarded back pay and allowances because of the allegedly unconstitutional deficiencies in his court-martial conviction.

Hendrix's case is based essentially upon two premises. The first is that the military personnel, especially his defense counsel, who were responsible for plaintiff's court-martial proceedings did not act in accordance with constitutional requirements. The second theory plaintiff advances is that the UCMJ, insofar as it empowers a court-martial to hear this type of controversial case, is inherently unfair and therefore unconstitutional. We deal separately with each of these contentions.

## A.

■ For plaintiff to succeed on his first claim—based on biased or ineffective military counsel and court-martial personnel— he must show that the alleged errors in his trial mounted to an unconstitutional deprivation of his Fifth and Sixth Amendment rights. *Cf. United States v. Augenblick,* 393 U.S. 348, 356, 89 S.Ct. 528, 21 L.Ed.2d 537 (1969); *Wimberley v. Laird,* 472 F.2d 923, 925–26 (7th Cir.), *cert. denied,* 413 U.S. 921, 93 S.Ct. 3071, 37 L.Ed.2d 1043 (1973). This is not an easy burden.

The first thing to say on this aspect of the case is that the prosecution's case against Hendrix was not at all weak if its witnesses were believed. The night of the "fragging," plaintiff had been on guard duty, not too far from where the "fragging" incident took place; during his watch Sergeant Tate (who was the main victim of the "fragging") had found him asleep (a serious military offense) and awakened him by placing his hands around his throat. Plaintiff must have known that in the morning he might well be charged with sleeping while on guard. The "fragging" took place shortly after plaintiff had gotten off guard duty. A fellow guard who had been on duty with Hendrix heard him come running down the hill from where Tate's bunker was located. The fellow guard asked plaintiff why he was breathing so hard, and Hendrix replied (according to the guard) that he had just dropped a "frag" ( a hand grenade) into Tate's bunker and he hoped that he had killed every "lifer" in the bunker. The same guard testified that Hendrix then went to sleep and later, when Tate's body was being removed, awoke and made another incriminating remark. Early the following morning the other guard was questioned by military investigative agents, and thereafter plaintiff was also questioned by them. According to the agents, plaintiff, after being advised of his rights, made an almost immediate full oral confession. The agents also found footprints near the Sergeant's bunker which were consistent with plaintiff's boots, and a scrape of paint on an ammunition box near the bunker which appeared the same as a paint scraping on plaintiff's boot. In this suit plaintiff does not challenge the sufficiency of the evidence, or the receipt either of the testimony by the fellow guard or of the agents' evidence as to the oral confession and the

**2.** UCMJ, Art. 138, 10 U.S.C. § 938 (1970).

real evidence. We therefore have to take it that the military jury could reasonably have convicted plaintiff on the evidence before them.

■ The assault here is on certain action by defense counsel, the military judge, and staff psychiatrists which, plaintiff says, deprived him of the effective assistance of counsel and of a trial comporting with due process. First, plaintiff states that his originally assigned defense counsel immediately suggested a guilty plea and told plaintiff to throw himself on the mercy of the court.[3] Because counsel's suggestion came at a time when plaintiff claimed to have no memory of the "fragging" incident and therefore believed himself innocent, plaintiff alleges that the guilty plea suggestion was coercive. We believe,. however, that such a suggestion, if made, was not so erroneous a defense tactic as to indicate incompetence or a pro-prosecution bias. Particularly here where the prosecution had a strong case,[4] and the choice of penalty could be death or imprisonment, a suggestion to plead guilty would be a maneuver sufficiently within proper bounds as to preclude the court from now (on collateral attack) undermining the defense counsel's choice.

■ Plaintiff claims, however, that the suggested guilty plea was merely the first step in his counsels' further incompetent and biased approach. He argues that counsel thereafter conducted a weak and dispirited defense, made other prejudicial errors and participated with military psychiatrists in convincing plaintiff that he was probably guilty but suffered from a "mental block" which prevented him from recalling the events on the night of the murder. But a review of the record indicates that military counsel did not demonstrate a defeatist attitude toward plaintiff's case. Rather, counsel argued for a change of venue back to the United States,[5] for new psychiatric testing (to see if an insanity defense could be raised), and for a pretrial agreement that would have ruled out the then permissible death sentence. At trial, counsel examined and successfully challenged prospective court-martial members, challenged the admissibility of the crucial oral confession to the investigative agents,[6] and thoroughly cross-examined prosecution witnesses. During the separate post-conviction mitigation phase, counsel attempted to reduce the potential severity of the sentence by extensive examination and presentation of psychiatric testimony; the obvious goal was to prevent the imposition of the death penalty and in this counsel were successful. All of these efforts on plaintiff's behalf demonstrate that his defense was clearly not abandoned at the outset or at any time during the court-martial.[7]

■ Another contention is that, at the psychiatric proceedings, which were ordered to test plaintiff's sanity, military counsel and psychiatrists "brainwashed" him to abandon his belief in his own innocence and to accept the fact that he may have been repressing his memories of the murder.[8] While Hendrix may now believe that he was coerced or brainwashed, the record does not demonstrate that the procedure or diagnosis of the military psychiatrists was

---

3. This particular accusation has been expressly denied by that counsel, former Captain Grant, in an affidavit filed by defendant here.

4. Defense counsel was quite aware that plaintiff had allegedly made severely incriminating statements immediately after the "fragging," again a few hours after the incident, and then allegedly made an almost immediate full oral confession when questioned by investigative agents the following morning.

5. This motion was designed to assist plaintiff to obtain desired non-military counsel and civilian psychiatric evaluation, a point discussed more fully, infra.

6. Though plaintiff did not take the stand on the merits, he did testify at the hearing on the admissibility of the oral confession.

7. See, e.g., United States v. Emerson, 44 C.M.R. 604 (1971).

8. The most that Hendrix ever said at the time of the inquiry by the psychiatrists was that, though he actually remembered nothing of the incident, it was possible that he had killed the sergeant and then repressed this memory.

beyond the bounds of their proper professional task; nor is there any showing that plaintiff was forced or improperly induced to acquiesce in their views of his mental state. The psychiatric inquiry was properly instituted to see whether an insanity defense could be interposed. Though the psychiatrists eventually found Hendrix sane, the information they unearthed was used at the mitigation stage of the trial and may well have been decisive in helping him escape the death penalty. Plaintiff also charges his counsel with error in allowing him to give unprivileged testimony to the military sanity board,[9] but, if this decision was erroneous at all, it was harmless since the material before the sanity board was not used by either side during the phase of the court-martial dealing with guilt or innocence. Plaintiff counters that Hendrix's statement to the psychiatrists (that he might possibly have committed the "fragging" and then repressed the memory) made it impossible for him to take the stand in his own defense on the issue of guilt. We doubt that it was so great an obstacle, but in any event it was important to the potential insanity defense and, even more, it was affirmatively helpful at the mitigation phase which, in view of the strength of the prosecution's case, was a most significant part of the trial. It was not ineffective assistance for counsel to make this choice (if choices had to be made).

█ Still another charge is that plaintiff's court-martial was tainted because one of his counsel told the military judge, outside the hearing of the court-martial members, that plaintiff wished to plead guilty to all charges. (No guilty plea was in fact entered—and none could be to the charge of murder.) The implication plaintiff urges is that the judge was thereafter biased and that his bias prejudiced his ruling on the admissibility of plaintiff's oral confession and other trial decisions. This assumes, without any proof whatsoever, that the judge could not act, and did not act, as a judge should. An allegation of this type must be specifically demonstrated and cannot rest on the merest speculation, which is all that plaintiff offers.[10]

█ Another in the litany of plaintiff's complaints is that he was deprived of his constitutional right to counsel. He had military counsel throughout, but urges that he also had a right to civilian counsel. The UCMJ, in Article 38(b), declares that a military defendant is entitled to civilian counsel, but only if furnished by the defendant, as well as the services of any military counsel if reasonably available. Plaintiff, who had expressed his desire to have civilian counsel, was notified by the judge of his right to obtain one. It is clear that the judge also made sure that sufficient time was allowed to obtain a civilian lawyer, and a three-month continuance period elapsed before the trial really commenced. When asked at this session whether he wished to proceed with his military counsel, plaintiff answered affirmatively. While the military judge did not elicit for the record the extent of the efforts made to procure civilian counsel,[11] the judge fulfilled his constitutional and statutory responsibilities when he inquired as to plaintiff's preference, allowed sufficient time for plaintiff to search for civilian assistance, and then asked him if he was willing to proceed with the military counsel available to him. Plaintiff's current contention that his decision to proceed was coerced rests on his belief that his counsel and psychiatrists "brainwashed" him to believe that he might be guilty. We cannot draw any such conclusion of coercion or undue influence, especially in light

9. The military do not recognize the doctor-patient privilege in these circumstances.

10. *See, e.g., Gallagher v. United States*, 423 F.2d 1371, 191 Ct.Cl. 546, *cert. denied*, 400 U.S. 849, 91 S.Ct. 58, 27 L.Ed.2d 86 (1970); *Griffiths v. United States*, 172 F.Supp. 691, 145 Ct.Cl. 669, *cert. denied*, 361 U.S. 865, 80 S.Ct. 128, 4 L.Ed.2d 107 (1959).

11. According to an affidavit by one of the military defense counsel, two civilian legal-aid lawyers in Vietnam reviewed plaintiff's file and determined that civilian legal assistance would not contribute significantly to plaintiff's defense in light of the competence of assigned military counsel.

of the procedures followed by the judge. Plaintiff was provided counsel as mandated by the Constitution and by the UCMJ, and it has not been shown that any problems which may have occurred in the search for *civilian* counsel were occasioned by wrongful government action or constituted a violation of statute or the Constitution.

■ We apply the same analysis to plaintiff's arguments concerning the retaining of civilian psychiatric witnesses. The judge denied plaintiff's change of venue motion, suggesting that civilian psychiatric assistance could be obtained in or brought to Vietnam if counsel really wanted it. There is no proof (or proffer of specific proof) that this assessment of the situation was a clear abuse of discretion amounting to a constitutional deprivation. Defense counsel's decision to utilize a military sanity board was a practical and tactical one which should not be second-guessed. It certainly did not cause the later proceedings to be unfair and may well have aided plaintiff in avoiding the extreme sanction.

In sum, we find that plaintiff's courtmartial was conducted well within the limits of the Constitution and any errors which may have been made did not so taint the proceedings as to vitiate the plaintiff's conviction from the constitutional standpoint.

### B.

■ The second major theory upon which plaintiff relies is that the court-martial was without jurisdiction to hear his case because the military justice system, insofar as it empowers courts-martial to hear a controversial case such as one involving "fragging" in Vietnam, is inherently unfair and therefore unconstitutional. This attack on the military justice system basically reiterates the broad argument against "command influence" which has been raised before. Plaintiff attempts to persuade us that this allegedly pervasive taint, when combined with the supposedly special prejudice felt

by military jurors against a serviceman accused of "fragging" one of their own, necessarily renders his conviction unfair.

This court has heard and rejected similar arguments before. We state again that we have not been persuaded that the military justice system is unconstitutional *per se* and we will not assume unfairness or prejudice against a court-martial defendant merely because the operative legislative scheme delegates to the convening authority multiple roles in the proceedings. *See McDonald v. United States*, 531 F.2d 490, 209 Ct.Cl. 62 (1976), *Gross v. United States*, 531 F.2d 482, 209 Ct.Cl. 70 (1976), *Jones v. United States*, 499 F.2d 631, 205 Ct.Cl. 270 (1974). As we stated in *Gross, supra*, Congress has at least twice seriously considered complaints about command influence and has designed safeguards to protect defendants' rights from prejudicial influence on the part of the convening authority.[12]

For this court to consider voiding a courtmartial conviction, the Supreme Court has indicated that we must be certain that any infirmities in the proceedings amounted to a violation of the defendant's constitutional rights. *United States v. Augenblick, supra*, 393 U.S. 348, 356, 89 S.Ct. 528, 21 L.Ed.2d 537 (1969). To convince us that unconstitutional violations occurred, a plaintiff must show proof of serious official impropriety particular to his case or at least demonstrate convincingly the actual injurious impact of the UCMJ's provisions on cases similar to his. For the reasons stated above in Part A, plaintiff here has failed to meet the first burden; he does not come near showing that there was any undue command influence in his particular case. The attempt to demonstrate the general invalidity of the military justice system is essentially the same as it was in *McDonald, supra*—a combination of affidavits giving the affiants' own experience with military justice (not involving plaintiff's case)[13] plus a listing of recorded or remembered cases in

12. See, for example, the UCMJ sections, cited in *Gross, supra*, 531 F.2d 482, 209 Ct.Cl. at 80–82, which Congress designed to protect against command influence.

13. Two of the affidavits are by individuals who also filed affidavits in the *McDonald* and companion *Sanders* cases.

which some element of command influence was revealed. We remain of the same view we expressed in *McDonald*: the plaintiff's showing of general unfairness, either as to the court-martial system as a whole or as to "controversial" cases, is too weak to overcome the presumption in favor of the choice made by Congress in establishing and revising the court-martial system. This type of episodic and *ad hoc* picking out of particular incidents and practices is not enough for a court to overturn the deliberate Congressional judgment.[14]

Plaintiff's motion for summary judgment is denied, the Government's motion for summary judgment is granted, and the petition is dismissed.

14. In view of our disposition, the defendant's motion to strike the plaintiff's affidavits becomes moot and need not be decided. The same is true of plaintiff's belated motion for leave to file an affidavit and report relating to the recent West Point cheating scandal. Plaintiff's equally late motion for call for information from the Marine Corps on alleged command influence in marijuana cases is denied.